STATE of Missouri, Respondent,

v.

Michael S. ROBERTS, Appellant.

No. 78050

Supreme Court of Missouri,
En Banc.

June 17, 1997.

Rehearing Denied Aug. 19, 1997.

Christopher E. McGraugh, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Christine M. Blegen, Assistant Attorney General, Jefferson City, for Respondent.

ROBERTSON, Judge.

A St. Louis County jury convicted Michael S. Roberts of first-degree murder and recommended that he be sentenced to death after hearing uncontroverted evidence that he beat fifty-six-year-old Mary Taylor to death with a hammer. At trial, Roberts claimed that he suffered from a mental disease or defect such that he lacked the capacity to deliberate prior to killing Ms. Taylor. On appeal, he claims, among other things, that the trial court erred in failing to submit a cautionary instruction required by section 552.030.5 and by permitting the jury to hear evidence of unrelated prior crimes. We have jurisdiction. Mo. Const. art. V, sec. 3. We affirm Roberts's sentence and conviction, as well as the trial court's decision overruling Roberts's Rule 29.15 motion.

## I.

From Michael Roberts's videotaped confession, the jury learned that on February 16, 1994, Roberts and his friends ran out of crack cocaine and money at the same time. He promised his friends that he would remedy the situation, went to his house, obtained a hammer and walked to the home of fifty-six-year-old Mary Taylor, eight doors away. Roberts claimed Ms. Taylor as a friend and believed that her "stuff" had value as a result of his familiarity with it.

Roberts rang Ms. Taylor's doorbell between 10:30 and 11:00 p.m. She let him in. They watched television together. Ms. Taylor took a phone call from her nephew. When the call ended, she and Roberts talked until Ms. Taylor said she wanted to go to sleep and asked Roberts to leave. The two walked toward the front door. Roberts suddenly turned, pushed Ms. Taylor over a table and began hitting her in the head with the hammer as she lay defenseless on the floor. Ms. Taylor pleaded with Roberts to stop. After hitting her in the head with a hammer more than fifteen times, he stopped the beating and went into the kitchen where he knew she kept her purse. Finding the purse, Roberts began rummaging through it until he heard Ms. Taylor move in the front room. Roberts returned to the living room and kicked Ms. Taylor in the head and side, telling her to stay still. Apparently not convinced that she would obey, he ripped the telephone cord from the wall, wrapped it around her neck, and pulled it as tight as he could. She continued to breathe. He ran to the kitchen, grabbed a steak knife and stabbed her repeatedly until he noticed that the knife's blade bent in that process. He tossed the steak knife aside, retrieved a butcher knife from the kitchen and began stabbing Ms. Taylor again. When that weapon did not seem "like it was penetrating her clothes," he went to the kitchen again, filled a large soup pan with water, took it to Ms. Taylor and held her face under the water. Noticing that brain matter had oozed onto his hands, Roberts felt queasy, but decided to continue. He repositioned his hand and forced her head under the water. When her body started to twitch, he "freaked out," released her head, took an answering machine and $200 and left, leaving the hammer and his Cleveland Indians baseball cap behind. He returned to Ms. Taylor's house twice—the first time to steal more valuables and her car and the second time to pretend to find her body and report the crime to the police.

## II.

### FAILURE TO GIVE INSTRUCTION
### MAI–CR 3d 300.20 and 306.4

Roberts does not dispute these facts. Indeed, the evidence that he killed Ms.

Taylor—even if one discounts his confession totally—is overwhelming and virtually uncontroverted. Because of what the jury could see so clearly from the physical evidence, Roberts decided to defend himself on the one issue the jurors could not see— his mental state at the time of the murder. He claimed that he suffered from a dysrhythmic activity of the brain affecting the frontal and temporal lobe; that this condition produced impulsive behavior, disinhibitive behavior, mood swings and loss of judgment and reasoning ability; and that, as a result, he lacked the mental capacity to deliberate before he killed Ms. Taylor.

To support and contest this claim of mental disease or defect excluding responsibility at trial, Roberts and the state offered testimony of mental health professionals offering opinions concerning Roberts's ability to deliberate. As part of that testimony, these witnesses revealed a history of sordid and violent acts Roberts had committed during and since his youth. These acts included sexual intercourse with his five-year-old sister when he was fifteen; sodomy of his five-year-old sister; arson; assaulting his mother; sodomy of his younger brother; assaults of inmates while in jail; and robbery. Prior to this testimony, Roberts's counsel asked the trial court to caution the jury with MAI–CR 3d 300.20. The trial court refused and similarly refused to instruct the jury in accordance with MAI–CR 3d 306.04 at the close of the evidence.

### A.

Section 565.020.1, RSMo 1994, defines first degree murder. "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." Section 552.015.2(8), RSMo 1994, permits the parties to present evidence relating to a defendant's mental state when a defendant claims he did not have "a state of mind which is an element of the offense," provided the defendant "files a written notice of his purpose to rely on [a defense of mental disease

or defect excluding responsibility]." Section 552.030.2, RSMo 1994.

Roberts initially filed a "Notice of Intent to Rely on the Defense of Mental Disease or Defect" and a "Motion for Mental Examination." Roberts founded the latter on sections 552.020 and 552.030. The trial court ordered the mental examination "as provided for under Sections 552.020 and 552.030." Roberts filed a subsequent "Motion for Psychiatric Examination of the Accused by a Physician of Defendant's Choosing" when the initial examination did not produce results to his liking. Section 552.030.3 expressly permits such an examination. Roberts's motion expressly cited section 552.030.3. The trial court's order sustained the motion "pursuant to Section 552.020," an apparent legal nonsequitur given the sole legal foundation claimed in Roberts's second motion.[1]

Subsequently, Roberts filed a "Motion Withdrawing Intent to Rely on a Defense of Mental Disease or Defect" and filed a "Notice of Intent to Present the Defense of Mental Disease or Defect to Negate a Culpable Mental State."

### B.

Section 552.030.5 provides:

No statement made by the accused in the course of any such examination and no information received by any physician or other person in the course thereof, whether such examination was made with or without the consent of the accused or upon his motion or upon that of others, shall be admitted in evidence against the accused on the issue of whether he committed the act charged against him in any criminal proceeding then or thereafter pending in any court, state or federal. The statement or information shall be admissible in evidence for or against him only on the issue of his mental condition, whether or not it would otherwise be deemed to be a privileged communication. If the statement or information is admitted for or against the accused on the issue of his mental condition, the court shall, both orally at the time

---

1. The state's brief contains the same error, citing section 552.020.5 when it quotes section 552.030.5. Resp. Br. at 29.

of its admission and later by instruction, inform the jury that it must not consider such statement or information as any evidence of whether the accused committed the act charged against him.

Roberts claims on appeal that the trial court erred in refusing to caution the jury in accordance with MAI–CR 3d 300.20 and instruct the jury with MAI–CR 3d 306.04.[2]

> The next witness to testify is [name of doctor]. He will testify concerning the mental condition of the defendant at the time of the alleged offense. In the course of his testimony, [name of doctor] may testify to statements and information that were received by him during or in connection with his inquiry into the mental condition of the defendant.
>
> In that connection, the Court instructs you that under no circumstances should you consider that testimony as evidence that the defendant did or did not commit the acts charged against him.

MAI–CR 3d 300.20. The state disagrees on two grounds. First, the state says that *State v. Strubberg,* 616 S.W.2d 809, 812–3 (Mo. 1981), prohibits using a section 552.020 examination for purposes of section 552.030. Second, even if the trial court erred in failing to caution and instruct the jury, the state claims that Roberts suffered no prejudice as a result of the error.

#### 1.

*Strubberg* contains these words: "[The defendant] was not entitled to and did not receive the .030 examination nor could his .020 examination be treated by the court as an .030 examination." This sentence is the fulcrum of the state's claim that the trial court did not err in refusing the profferred instructions. In context, however, *Strubberg* says:

> Appellant did not plead not guilty by reason of mental disease or defect excluding responsibility for the acts charged nor did he give written notice of his intent to rely on such defense. He was not entitled to and did not receive the .030 examination nor could his .020 examination be treated

by the court as an .030 examination. It was not error for the court to fail to give [MAI–CR3d 300.20] in this case.

*Id.* at 817.

In this case, the defendant gave notice of his intent to rely on a defense of mental disease or defect excluding responsibility. Where a defendant files a timely notice of intent or a notice is accepted by the trial court as establishing good cause for a late notice of intent to rely on a defense of mental disease or defect excluding responsibility, section 552.030.2, it is the use to which the defendant puts the mental examination that determines whether the trial court must give the mandatory instruction. *Strubberg* does not apply.

#### 2.

In *State v. Kreutzer,* 928 S.W.2d 854 (Mo. banc 1996), this Court held that

> [i]f any statement or information obtained from the section 552.030 examination is admitted, the trial court must, orally at the time of its admission, and, later, by instruction, inform the jury that it must not consider the statement or information as evidence of whether the accused committed the act charged against him.

*Id.* at 870. The failure to give a required instruction is error. The trial court failed to give the required instruction and erred in so doing.

#### 3.

When a trial court errs in failing to give a required instruction, reversal is not mandated unless the defendant suffers prejudice as a result of the error. Prejudice occurs where the jury "may have been adversely influenced by an erroneous instruction or by the lack of an instruction required by statute." *State v. Betts,* 646 S.W.2d 94, 98 (Mo. banc 1983).

A crime generally consists of two elements: the physical, wrongful deed (the *actus reus* ) and the guilty mind that produces the act (the *mens rea* ). *Kreutzer* holds that

---

**2.** MAI–CR 3d 306.04 is the written instruction provided for the jury prior to deliberation. In

substance, though not in verbiage, it is identical to MAI–CR 3d 300.20.

[t]he 'acts' to which the limiting instruction [MAI–CR 3d 300.20 and 306.40] refers are only those actions that culminated in the death [of the victim]. . . . [T]he instruction emphasizes to the jury that it must consider such testimony only in its determination of whether appellant had the *mens rea* necessary to be guilty of murder in the first degree.

*Id.* at 871.

In this case, Roberts confessed to the *actus reus.* Defense counsel acknowledged to the jury on several occasions that Roberts had killed Ms. Taylor. "When a defendant makes a voluntary judicial admission of fact before a jury, it serves as a substitute for evidence and dispenses with proof of the actual fact and the admission is conclusive on him for the purposes of the case." *State v. Olinger*, 396 S.W.2d 617, 621–2 (Mo. banc 1965).

■ By conceding that he killed the victim, Roberts could not have been harmed by the failure of the trial court to give the limiting instructions. This is because the only issue before the jury after the admission was whether Roberts deliberated prior to doing what he admitted he did. The jury did not need to be warned that it should not use the mental health experts' testimony as proof that Roberts committed the murder. Roberts's trial admission removed that issue from the jury's consideration.

The point is denied.

## III.

## EVIDENCE OF VOLUNTARY INTOXICATION

Anticipating that defense counsel would attempt to introduce expert testimony that Roberts's cocaine high impaired Roberts's ability to deliberate when considered with Roberts's disrhythmic activity of the frontal and temporal lobes, the state filed and the trial court sustained a motion in limine to bar such evidence for purposes of an attempt to negate a culpable mental state. During the trial Roberts made an offer of proof. Again, the trial court refused to admit the evidence. Roberts assigns error to these rulings.

### A.

■ "[A] jury may not consider [voluntary] intoxication on the issue of the defendant's mental state." *State v. Erwin*, 848 S.W.2d 476, 482 (Mo. banc 1993). This rule, reiterated by the legislature in section 562.076.3, RSMo 1994, is over a century old and recognizes that a voluntarily intoxicated person maintains his or her responsibility for his or her conduct. A person who voluntarily puts himself or herself into a drugged condition is capable of forming an intent to kill. That the drugs may remove a person's inhibitions and make the person more likely to act rashly, impulsively and anti-socially and increase the person's susceptibility to passion and anger does not alter the person's capacity to intend to kill.

Section 562.076.3 recognizes an exception to this general rule. "Evidence that a person was in a voluntarily intoxicated or drugged condition may be admissible when otherwise relevant on issues of conduct but in no event shall it be admissible for the purpose of negating a mental state which is an element of the offense."

■ Section 562.076.3 prohibits a defendant from introducing evidence of voluntary intoxication as *per se* proof of an inability to form a culpable mental state. However, the statute permits the introduction of voluntary intoxication evidence to rebut the inferences the state seeks to draw from a defendant's conduct. *State v. Taylor*, 929 S.W.2d 925, 928 (Mo.App.1996).

Roberts's argument for the admission of the intoxication evidence proceeds along two lines: First, he notes that *Erwin* says: "The circumstances under which intoxication may be relied upon to establish the defense of diminished mental capacity is not properly before us in this case and, therefore, need not be decided." *Id.* at 484. The legislature adopted section 562.076.3 after this Court decided *Erwin.* Second, he argues: (1) that evidence of his drugged condition is admissible to explain his conduct; (2) that his conduct is significant "regarding his mental state;" and (3) where evidence of a voluntary drugged condition explains his conduct, the trial court errs in not admitting the evidence.

As to the first argument, the defense of diminished mental capacity Roberts offered at trial admits the acts committed but denies that he possessed the mental ability to deliberate because of the effects of the cocaine on his pre-existing mental condition. Roberts does not explain how this evidence is "otherwise relevant to issues of conduct." The evidence Roberts argues the trial court should have admitted was evidence of the effects of cocaine. He claims that the expert testimony would have shown that the cocaine decreased his ability to control his primitive urges. His argument is an attempt to show that the cocaine itself relieved him of whatever capacity he possessed to deliberate by altering the chemical balance in his already-unbalanced brain. Section 562.076.3 clearly and unambiguously prohibits introduction of a voluntary drugged condition to negate a culpable mental state, even where the drugged condition exacerbates a tendency toward rage and anti-social behavior. If the underlying mental condition does not result in diminished capacity without the drug, the presence of the drug does not change the evidentiary calculus. We conclude that where a defendant's argument amounts to a but-for-the-drugs-I-voluntarily-took-I-would-not-have-committed-this-crime-argument, section 562.076.3 and *Erwin* prohibits the introduction of evidence of a voluntary drugged condition as per se proof that he could not possess the requisite culpable mental state.

The second prong of Roberts's argument focuses on his conduct during, not prior to, the murder. He claims that the state used the horrible manner in which he murdered Ms. Taylor to show that he intended to kill her. He says that the evidence he wished to present is relevant conduct evidence under section 562.073.3 and would have shown the jury that it was "impossible for [him] to **break off** the attack against Ms. Taylor **once it started.**" (Emphasis added.) Reply Br. at 12.

Absent a confession by the actor that reveals his or her intent, a person's mental state can be known only through the person's actions. Evidence of a person's conduct raises inferences that point toward or away from a conclusion that the person possessed a culpable mental state. Evidence of conduct that is relevant to the issue of deliberation in a first degree murder case falls into a least four broad categories. First, there may be direct evidence that the defendant did or said certain things in advance of the act to facilitate the crime. This is "planning evidence." Second, there may be evidence of a pre-existing relationship between the victim and the defendant prior to the murder that provides a motive for the killing. This is "bad-blood evidence." Third, there may be no direct evidence of planning, but the complicated manner in which the defendant carried out the crime shows that the murder could not have been committed as a result of a spur-of-the-moment decision to act. This is "complicated-design evidence." Fourth, there may be evidence that the defendant failed to take action that a person who did not possess a guilty mind would be expected to take. Most often this conduct occurs after the crime is committed. This is "failure-to-act" evidence.

Conduct evidence to which voluntary intoxication is relevant under section 562.076.3 is most often failure-to-act evidence. This is because evidence of a defendant's **failure** to act raises inferences of a guilty mind. Chemical impairment of the reasoning processes may rebut these inferences and is therefore relevant to issues of conduct. *State v. Taylor,* 929 S.W.2d 925, 928 (Mo.App.1996), upon which Roberts relies, is a failure-to-act case. But Roberts's case is a planning evidence case. For this reason, *Taylor* does not assist Roberts.

In a planning-evidence case, intoxication may increase a person's willingness to carry out a murderous plan, but it neither explains the deliberative acts nor rebuts the inferences of planning those acts raise. This is because the purpose of the intoxication evidence is to show that the defendant did not have the capacity to deliberate because of that condition. Evidence claiming a drug-induced absence of the capacity to deliberate does not rebut nor explain planning evidence clearly showing deliberation. Thus, intoxication evidence in a planning evidence case is an attempt to show that the defendant could

not deliberate because of the intoxication. This is evidence that section 562.076.3 expressly prohibits.

■ The planning evidence in this case—Roberts's carrying a hammer with him to Ms. Taylor's home after promising his companions that he would take care of their drug shortfall—is proof of his deliberation. The numerous, unprovoked, and ultimately-fatal hammer blows to her head merely carried out his already-formed plan to kill her. Roberts's claim that the cocaine made it impossible to stop the murder after delivering the first few hammer blows does not rebut the state's evidence of deliberation prior to the murder.

The point is denied.

## B.

■ Roberts also believes the trial court erred in giving the jury the following instruction:

The state must prove every element of the crime beyond a reasonable doubt. However, in determining the defendant's guilt or innocence, you are instructed that an intoxicated or drug condition whether from alcohol or drugs will not relieve a person of responsibility for his conduct.

Roberts contends that the instruction directs the jury to assume that a voluntarily intoxicated person has the requisite mental state to commit the crime in question. This assumption, in effect, relieves the state of its burden of proving all of the requisite elements of the crime. Roberts claims that a similar instruction was found improper by this Court in *State v. Erwin,* 848 S.W.2d 476 (Mo. banc 1993).

The instruction given is based upon MAI–CR 3d 310.50, which was revised in response to this Court's decision in *Erwin* by adding the first sentence regarding the state's burden to prove every element beyond a reasonable doubt. This instruction does not suffer from the infirmity of the previous MAI–CR 3d 310.50 (revised) condemned in *Erwin.* This instruction has been upheld by all three districts of the Missouri court of appeals. *See State v. Pointer,* 932 S.W.2d 871, 873–874 (Mo.App.1996); *overruled on other grounds,*

*State v. Carson,* 941 S.W.2d 518 (Mo.1997); *State v. Armstrong,* 930 S.W.2d 449, 451–452 (Mo.App.1996); and *State v. Bell,* 906 S.W.2d 737, 740 (Mo.App.1995), *overruled on other grounds, State v. Carson,* 941 S.W.2d 518 (Mo.1997). Moreover, similar instructional language was upheld by the United States Supreme Court in *Montana v. Egelhoff,* —— U.S. ——, —— – ——, 116 S.Ct. 2013, 2022–23, 135 L.Ed.2d 361 (1996). The instruction was proper.

The point is denied.

## IV.

### EVIDENCE OF UNCHARGED CRIMES

Roberts's brief asserts that the trial court erred in failing to sustain his motion to excise portions of his videotaped statement that described other crimes and prior bad acts. Specifically, he claims that his statements that he drove at excessive speed; stole license plates from cars at the Mid–Rivers Mall; wanted a pistol to kill the persons who "stole" Ms. Taylor's car from him; didn't have a pistol or he would have gone into a rage and killed the persons who "stole" Ms. Taylor's car from him; and burglarized Florrisant Mitsubishi prior to killing Ms. Taylor should not have been allowed into evidence. In addition, Roberts wishes the trial court had excluded his statements of Ms. Taylor's plea to God for help during the murder and Roberts's conclusion that God did not come to her rescue; that Ms. Taylor had a strong will to live; that Ms. Taylor appeared to be trying to breathe under water; and that Roberts felt Ms. Taylor's brain matter with his hand when he held her head under water in the bowl.

■ The second category of evidence of which Roberts complains—the evidence of Ms. Taylor's verbal and physical responses to his efforts to kill her—is admissible as details of the crime. The trial court did not err in permitting the jury to hear this evidence.

■ We next consider the evidence Roberts characterizes as prior bad acts/other crimes evidence. The day after the murder, Roberts drove around St. Louis in Ms. Taylor's car. According to Roberts, someone

"stole" the car from him and, in that act, also stole Roberts's house key, which he had left in the car. According to the state's theory, Roberts murdered Ms. Taylor to steal cash and items of property from her. Specifically as to the evidence concerning Ms. Taylor's car, the state posited that the loss of his house key led Roberts to return to Ms. Taylor's house and ultimately to concoct his story that he left his ball cap there and that he discovered the body.

In *State v. Skillicorn*, 944 S.W.2d 877, 887 (Mo. banc 1997), this Court wrote that other-crimes evidence is admissible if it "has some 'legitimate tendency to prove that the accused committed the crime for which he is being tried.' *[State v.] Buxton[*, 324 Mo. 78], 22 S.W.2d [635] at 636 [(Mo. 1929)], and is more probative than prejudicial. *[State v.] Bernard*, 849 S.W.2d [10] at 13 [(Mo. banc 1993)]." *Skillicorn* holds that where the evidence "is a continuation of the sequence of events that presents a coherent picture" of the defendant's crime, the other-crimes evidence is admissible. *Id.*

The car evidence in this case is a continuation of a sequence of events that presents a coherent picture of Roberts's crime. Moreover, Roberts's admitted murderous mental state at the loss of the car shows that Roberts had the capacity to deliberate prior to committing the murder of Ms. Taylor and that he believed killing another human being was the appropriate response when that person possessed something he wanted. The evidence is admissible for those reasons.

The remaining evidence Roberts challenges relates to uncharged prior crimes about which Roberts spoke during his videotaped statement. Roberts claims that *State v. Bernard*, 849 S.W.2d at 10, requires reversal.

 *Bernard* recognizes five categories of exceptions to the general rule prohibiting admission of evidence of uncharged misconduct and adds a sixth exception. Such evidence is admissible if it tends to establish (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish proof of the other; (5) the identity of the person charged with the commission of the crime on trial; or (6) a signature modus operandi. *Skillicorn* notes a seventh category permitting evidence of a continuation of a sequence of events that assist in painting a coherent picture of the crime. *Id.* at 887. The list of exceptions to the general rule is not exclusive but, in each instance, announce a judicial conclusion that the prior-bad-acts evidence is both logically and legally relevant. *See State v. Sladek*, 835 S.W.2d 308, 315 (Mo. banc 1992) (Thomas, J., concurring).

 There is no claim in this case by the state that the speeding and license plate episodes are related in any way to the murder of Ms. Taylor. The evidence is not admissible. The trial court erred in failing to sustain the motion to excise those portions of the videotape.

The state argues that the burglary of the Florissant Mitsubishi a "few" days prior to Ms. Taylor's killing was part of a common scheme or plan and thus admissible. The state does not argue that the burglary evidence shows Roberts's ability to deliberate.

To set the factual stage, Roberts's family contracted to clean the automobile dealership after hours. Roberts left a door unlocked one evening and returned with friends to help themselves. Someone had locked the door. Roberts and his companion broke in and stole "some things." Roberts sold the fruits of this effort to buy crack cocaine.

 In *State v. Harris*, 870 S.W.2d 798, 810 (Mo. banc 1994), this Court held that the common scheme or plan exception applies when another crime is "interconnected to and nearly contemporaneous with a murder ... and set the context for that offense." Said better, the common scheme or plan exception most often applies when the evidence tends to show that the uncharged misconduct proceeds from a single plan formed in advance of both crimes. *Sladek*, 835 S.W.2d at 315.

 This is not a single-plan case. The evidence does not support a conclusion that Roberts's use of crack cocaine caused him to plan both the burglary and the murder before Roberts committed each. Indeed, the

evidence in this case leads to another conclusion: Roberts killed Ms. Taylor only after the proceeds from the car dealership break-in proved insufficient to feed his habit. The trial court erred in failing to sustain the motion to excise this portion of Roberts's statement.

■ In the presence of trial court error, reversal is required if the error more-likely-than-not prejudices the entire proceeding against the defendant. This kind of prejudice is outcome-determinative and expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence. This outcome-determinative prejudice is different from the prejudice a trial court considers when it weighs the probative value of a piece of evidence against its potential for prejudice. This latter prejudice is evidence specific.

■ The trial court's error in this case results in evidence-specific prejudice, not outcome-determinative evidence. The evidence of Robert's guilt is essentially uncontroverted and overwhelming. There is virtually no danger that the jury would have found Roberts guilty of murder to which he confessed because he drove too fast, stole license plates and committed a minor burglary.

The point is denied.

## V.

## IMPROPER CLOSING ARGUMENT

### A.

■ Roberts raises numerous claims of allegedly improper argument by the prosecutor during closing argument of both the guilt and penalty phases of the trial. Defense counsel raised no objection during either argument. Thus, any review would be only for plain error. *State v. Ervin,* 835 S.W.2d 905 (Mo. banc 1992). Rule 30.20. The "plain error" rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review. *Ervin,* 835 S.W.2d at 920. Appellant must demonstrate that manifest injustice or a miscarriage of justice will occur if the error is not corrected. *State v. Parker,* 856 S.W.2d 331, 333 (Mo. banc 1993).

In *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc 1995), we said:

[U]nless a claim of plain error facially establishes substantial grounds for believing that "manifest injustice or miscarriage of justice has resulted," this Court will decline to exercise its discretion to review for plain error under Rule 30.20. We will, however, consider related claims of ineffective assistance of counsel for failure to preserve the alleged trial error under the test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

None of appellant's unpreserved claims regarding closing argument raise a substantial ground for finding plain error. Therefore, we decline to subject these claims to our discretionary review under Rule 30.20.

### B.

Alternatively, Roberts claims his trial counsel were ineffective in failing to object to the complained-of statements. To prevail, Roberts must show that counsels' performance was deficient, i.e., below the degree of skill, care, and diligence of a reasonably competent attorney, and that the deficiency prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Counsel's performance, of course, is presumed competent. *Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66. Furthermore, counsel's actions that constitute sound trial strategy are not grounds for ineffective assistance claims. *State v. Whitfield,* 939 S.W.2d 361, 369 (Mo. banc 1997). Even if Roberts demonstrates error on the part of his counsel, he must also show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. If Roberts fails to satisfy either the performance or the prejudice prong, this Court need not even consider the other. *Whitfield,* 939 S.W.2d at 369.

The motion court found no ineffective assistance regarding Roberts's claims. On review, we determine whether the court's findings and conclusions are clearly erroneous. We will reverse the motion court's rulings only if, after a review of the whole record, we are left with the definite and firm impression a mistake has been made. *State v. Taylor,* 929 S.W.2d 209, 224 (Mo.1996).

### 1.

### Guilt Phase

### a.

### Prior Bad Acts

During guilt-phase argument, the prosecutor said:

His whole life his personality from kindergarten every person that he has been close to, ... kids in the classroom, paint in their hair, spitting, fighting, kicking, his mother, beating her, raping his sister, blaming it on her—everything that he's done his whole life he's not been held accountable for. And hasn't taken blame.

He blamed it on the five-year-old. Well, she consented to it. Five-year-old consented to sexual intercourse with a fifteen-year-old. But, in his mind she consented. Rationalization.

Defense counsel did not object.

As discussed earlier, Roberts submitted medical, school, counseling, and jail records upon which his expert, Dr. Stacy, relied in forming his testimonial opinion as to whether Roberts was capable of deliberation. Roberts's past aberrant behaviors, all of which were reported in these records, came out either on direct examination as evidence to support Dr. Stacy's diagnosis or during cross-examination to impeach or challenge Dr. Stacy's opinion.

Roberts also contends that the prosecutor referred to uncharged crimes that impermissibly came in as part of Roberts's statement to the police. The prosecutor noted that "Mr. Roberts was driving around shopping centers stealing license plates."

We assume for purposes of argument that Roberts's trial counsel should have objected

to these statements and that it fell below the standard of reasonable skill and diligence for counsel to fail to do so. Under *Strickland,* Roberts must also show a reasonable probability that his counsel's performance resulted in a different outcome at the trial. Roberts has not made such a showing. The evidence of guilt is overwhelming. The jury knew of much of this prior-bad-acts evidence because Roberts introduced it as a result of his attempt to show that he could not deliberate prior to killing Ms. Taylor. The argument about stealing the license plates is improper, but a minor infraction in light of the evidence in this case.

The motion court did not abuse its discretion in refusing to find ineffective assistance of counsel.

### b.

### Improper Personalization

Roberts finds his counsel ineffective for failing to object when the prosecutor said:

.... in an effort to protect citizens of the St. Louis Community and that's what you are as this jury. You are the last line of protection in this system; it is up to you whether you protect the citizens of St. Louis County or you don't.

and

If you follow (Dr. Stacy's) opinion and his opinion is flawed then you have no protection, the citizens of St. Louis County, because you found the Defendant guilty of the wrong crime.

Roberts argues that arguments urging the jury to protect community values, preserve civil order, or deter future lawbreaking are impermissible.

A prosecutor may argue the need for strong law enforcement, the prevalence of crime in the community, and that conviction of the defendant is part of the jury's duty to uphold the law and prevent crime. *State v. Olds,* 603 S.W.2d 501, 511 (Mo. banc 1980). The prosecutor may urge the jury to consider the effect upon society if the law is not upheld. *Id.* The state's arguments were permissible, and counsel cannot be faulted for failing to make meritless objections.

*State v. Weaver,* 912 S.W.2d 499, 518 (Mo. 1995).

**2.**

**Penalty Phase**

**a.**

**Arguing Facts Outside the Record**

■ The prosecutor said: "This is as brutal a murder as ever occurred in St. Louis County." Defense counsel did not object. Roberts believes this failure constituted ineffective assistance. There was no evidence of the relative brutality of other murders in St. Louis County and, thus, the prosecutor's comments were improper in that he argued facts outside of the record.

■ This Court found a similar statement erroneous in *State v. Storey,* 901 S.W.2d 886, 900 (Mo. banc 1995). ("This case is about the most brutal slaying in the history of this county.") The state concedes that this statement was improper. However, failure to object to improper argument is not, *per se,* ineffective assistance of counsel. *State v. Copeland,* 928 S.W.2d 828, 843 (Mo. banc 1996). In determining whether counsel was ineffective, the court must weigh many factors, including counsel's reason for not objecting, whether the jury was properly instructed on the law, and whether, considering the total context of the trial, a reasonable probability exists that the outcome would have been different absent the improper argument. *Id.*

■ Defense counsel, at the Rule 29.15 hearing, testified that he did not object because he did not believe the statements hurt Roberts because, even in defense counsel's opinion, the crime was very brutal. Defense counsel said, "The brutality of the crime was something in this case that in developing a theory and planning a strategy I felt like we had to accept and work with." Thus, defense counsel's decision not to object was strategic. It also appears from the record that the jury was properly instructed on the law. In particular, the court's instruction told the jury that the arguments of the attorneys are not evidence. This militates against finding ineffective assistance of counsel in failing to ob-

ject in this instance. *Copeland,* 928 S.W.2d at 844. Finally, there is simply no reason to believe, in light of the overwhelming evidence of guilt in this case and the obvious brutality of the crime, that the outcome of the trial would have been any different absent the prosecutor's improper argument. The trial court did not err in finding no ineffective assistance for failing to object to this statement.

**b.**

**Improper Personalization**

■ Roberts contends that the prosecutor improperly personalized the argument to the jury by making the following statements during the closing of penalty phase:

What happened here is horrible and it effects everybody.

.　.　.　.　.

It reduces the quality of life for everybody in the whole County of St. Louis, a crime of this. It's not just a one-person crime.

.　.　.　.　.

We're not gonna hit him in the head with a hammer 30 times and we're not gonna stab him in the back 12 times and we're not gonna try and cut his head off and we're not gonna try and strangle him. His death will be different. And he'll have time to make peace with his maker as Mary did not have for herself.

.　.　.　.　.

First thing you're gonna do when you get home tomorrow is you're gonna give your kids a hug like you've never given them before. And you're gonna pray to God that they never have to find you in this condition.

.　.　.　.　.

His death will be a thousand times easier than Mary's death. A thousand times easier.

.　.　.　.　.

It was so bad. It was so awfully painful. It was such a horrible, horrible death. Think about what Mary went through.

.　.　.　.　.

He is a Monster.

. . . . .

This the most God-awful crime. It's God-awful.

None of the above arguments amount to improper personalization. They do not suggest personal danger to the jurors or their families if Roberts were to be acquitted. *State v. Copeland*, 928 S.W.2d at 842. Nor do the above comments, read in context of the entire closing argument, present a situation like that in *Storey* where the jurors were asked to place themselves in the position of the victim and relive the crime in graphic detail.

The point is denied.

### c.

### Improper Comments and References to Prior Bad Acts and Uncharged Crimes

 During penalty phase closing argument, the prosecutor observed with regard to Roberts, "He has abused victim after victim after victim." The prosecutor also said, "He is a monster. He raped his five year old sister." Roberts contends that the prosecutor should not have been able to reference these prior bad acts and uncharged crimes, and defense counsel was ineffective in failing to object to these comments.

Where the jury is reminded of evidence in the penalty phase that the defendant put forward in support of his unsuccessful defense during the guilt phase, the defendant cannot complain that his counsel was ineffective in failing to object. This Court has upheld a prosecutor's statements during a death-penalty penalty phase argument that the defendant is "evil" or a "predator" where the evidence supports that characterization. *State v. Simmons*, 944 S.W.2d 165, 182 (Mo. banc 1997). Roberts's own evidence provides the basis for the prosecutor's statement and the characterization that follows. The motion court did not err in failing to find defense counsel ineffective for failure to object on this point.

### d.

### Community Responsibility/Appeal to Fear and Prejudices

 Roberts claims his counsel was ineffective in failing to object to the prosecutor's arguments that the jury should recommend the death sentence to protect the community. The prosecutor told the jury, "You're not representing yourself in this case, you're representing the community." Recommending the death sentence would be "a statement of the community that this type of crime is outrageous." The murder was "horrible and it effects everybody, it reduces the quality of life for everybody in the whole county of St. Louis, a crime like this is not just a one person crime." The prosecutor exhorted, "This is not gonna happen in St. Louis County, we're going to deter other murderers from committing these crimes and we're gonna punish those that do. We have to protect ourselves."

Roberts contends his counsel should have objected because these arguments impermissibly urged the jury to convict in order to protect community values or deter future lawbreaking. Roberts also contends that the prosecutor's statements misled the jury to believe that the decision to impose the death penalty should be based upon community standards rather than the evidence presented at trial.

 As previously stated regarding similar arguments made during the guilt-phase closing arguments, a prosecutor may argue the need for strong law enforcement, the prevalence of crime in the community, and that conviction of the defendant is part of the jury's duty to uphold the law and prevent crime. *State v. Olds*, 603 S.W.2d 501, 511 (Mo. banc 1980). The prosecutor may urge the jury to consider the effect upon society if the law is not upheld. *Id.*

 Roberts's argument that the jury based its sentencing recommendation on community values rather than the evidence is equally meritless. The jury was properly instructed that arguments are not evidence, and that in order to recommend the death sentence, the jury had to find at least one aggravating circumstance based on the evi-

dence. There was overwhelming evidence in this case to support a recommendation of the death penalty. It borders the frivolous to suggest that the jury based its sentencing recommendation in this case on something other than the overwhelming evidence of aggravating circumstances. The prosecutor's arguments were permissible and were not misleading. Defense counsel could not be found ineffective in failing to object in this instance. *State v. Weaver*, 912 S.W.2d 499, 518 (Mo.1995).

### e.

### Other Arguments

■ Roberts raises two other arguments to which he claims his counsel should have offered objection. During the state's rebuttal argument at the penalty phase, the prosecutor, after noting defense counsel's eloquent pleas for mercy, stated, "Where was Mr. Slusher [defense counsel] in his pleas for mercy on February 16th?" Roberts argues that this comment somehow draws a negative inference regarding his right to trial, right to counsel, and right to due process. The prosecutor's comment does nothing of the kind.

The point is denied.

■ Roberts claims that the prosecutor made an improper reference to religion when he said the following:

> We're not gonna hit him in the head with a hammer 30 times, we're not gonna stab him in the back 12 times, and we're not gonna try to cut his head off and we're not gonna try to strangle him. His death will be different. He'll have time to make peace with his maker as Mary did not have for herself.

Such a statement does not rise to the level of excessive references to Scripture, against which this Court cautioned in *State v. Shurn*, 866 S.W.2d 447, 464 (Mo. banc 1993), and *State v. Debler*, 856 S.W.2d 641, 656 (Mo. banc 1993). Roberts also claims that the above statement improperly invited the jury to weigh Mary Taylor's death against his own death. It did not. The prosecutor's statements were not improper, defense counsel was not ineffective in failing to object, and the trial court did not err in so finding.

### VI.

### DENIAL OF JURY REQUEST FOR DEFENSE EXHIBITS

Roberts asserts that the trial court erred in refusing to provide certain defense exhibits to the members of the jury during their deliberation. Among the exhibits Roberts submitted were over 1000 pages of medical records from Christian Northwest Hospital, Children's Hospital Medical Center, Cardinal Glennon Hospital, Malcolm Bliss, the Family Resource Center, Hawthorne Children's Hospital, Evangelical Children's Home, as well as records from elementary school, the Division of Family Services, and jail. These records served as the basis for the opinions of Drs. Dysart, Stacy and Rabun as to whether Roberts was capable of deliberation on the night of Ms. Taylor's murder. These records also contained reports of numerous prior bad acts and uncharged crimes, which Roberts contended should not have been put into evidence nor argued at trial. The trial court admitted all of these unredacted records without objection.

Early in the jury's deliberations, the foreperson sent a message requesting a review of all of the defense exhibits. The court refused to send these exhibits to the jury because of their considerable volume and the fact that they contained matters that may not have been admissible. The jury, sans the records, returned a guilty verdict after a little more than 90 minutes of deliberation. Defense counsel moved for a mistrial on the grounds that the requested exhibits should have been provided to the jury because without them, the jury was unable to review evidence that corroborated the defense theory. Roberts also contends that the trial court's refusal amounted to an improper comment on the defendant's evidence. The trial court refused to grant a mistrial.

■ Even where an exhibit is properly admitted into evidence, the decision whether the exhibit should be sent back to the jury during deliberations remains a matter within the sound discretion of the trial court. *State v. Graham*, 641 S.W.2d 102, 108 (Mo. banc 1982). We will find an abuse of discretion

only where the trial court's decision was clearly against reason and resulted in an injustice to defendant. *State v. Sullivan*, 925 S.W.2d 483, 485 (Mo.App.1996).

The trial court did not abuse its discretion in declining to provide the jury with Roberts's voluminous medical records for review during deliberation. Nor did the trial court's decision amount to an impermissible comment on the defendant's evidence, as Roberts suggests. The records were over 1000 pages in length and contained many matters not discussed at trial, as well as hearsay, irrelevant information, and information that could easily be misconstrued. While Roberts contends that redacted versions of the records could have been submitted, it does not appear that this would have been a practical solution under the circumstances. Moreover, to the extent that the records evidenced relevant matters, such issues were also testified to by Roberts's experts. Under these circumstances, we do not find the trial court's decision on this matter was clearly against reason. In light of the considerable testimony by the experts as to the events reported in the records, Roberts did not suffer an injustice because the jury was not also able to review the records during deliberation.

## VII.

### REMOVAL OF DEATH–SCRUPLED JURORS

Roberts maintains that the trial court erred in striking for cause venirepersons Walsh, Sutterfield, Jeffries, Laramie, Hanks, and Benson.[3] According to Roberts, all of these venirepersons could have considered the death penalty and followed the law and, therefore, should not have been stricken for cause.

Venirepersons may not be excluded simply because of general objections to the death penalty or conscientious or religious scruples against it. *Gray v. Mississippi*, 481 U.S. 648, 657, 107 S.Ct. 2045, 2050–51, 95 L.Ed.2d 622 (1987). Venirepersons may

be excluded only where it appears that their views would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions and their oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Because the trial court is in the best position to evaluate venirepersons' responses, it has broad discretion in determining qualifications of prospective jurors. *State v. Kreutzer*, 928 S.W.2d 854, 866 (Mo. banc 1996). We will not disturb the trial court's ruling unless it is clearly against the evidence and constitutes a clear abuse of discretion. *State v. Kinder*, 942 S.W.2d 313, 324 (Mo. banc 1996).

The trial court struck Venireperson Walsh because she asserted that, as an employee of the Special School District, she did not feel she could be fair and impartial in the case because Roberts had at one time been involved with the Special School District. We have reviewed her statements during voir dire. They support the trial court's decision.

Venireperson Sutterfield said, "I don't want the blood on my hands for somebody having the death penalty. It's not my place to take somebody else's life for killing someone else." She said that she could not consider both punishments and could not be fair and impartial under the law. While she told defense counsel that she could consider either punishment, she later said in response to the state's question that she could not opt for the death penalty in any case. The qualifications of a prospective juror are not determined by a single response, but are based on the entire voir dire examination. *State v. Kreutzer*, 928 S.W.2d at 866. Where there is conflicting testimony regarding a prospective juror's ability to consider the death penalty, the trial court does not abuse its discretion by giving more weight to one response than the other and in finding that the venireperson could not properly consider the death penalty. *State v. Kinder*, 942 S.W.2d at 324–25. On this record, the trial court reasonably could have concluded that Sutterfield's

---

**3.** Roberts also claims that venireperson McMahon was improperly stricken for cause, but

makes no specific argument as to McMahon.

views would "substantially impair" her ability to follow the law and perform her duties as a juror. The trial court did not abuse its discretion in dismissing Sutterfield for cause.

■ Venireperson Jeffries equivocated as to whether he could consider the death penalty. He repeatedly said that he was "not sure" if he could consider the death penalty. He felt that his views that there should be another option other than death or life without parole might prevent him from imposing the death sentence. While at one point he said he could consider it, at other points, he said that he could not. In direct response to the trial court's question, Jeffries said, "I don't think that I could consider the death penalty." He said that he would follow the court's instructions to the best of his ability, but he was not sure that he could. Whether he could consider the death penalty appeared to hinge on how one defined "consider." Ultimately, the state moved to strike Jeffries for cause. The court, on considering the entire examination, decided to strike him for cause. On reviewing the record, we do not find that the court's decision was an abuse of discretion.

■ Venireperson Laramie said he "might have a problem with imposing the death penalty." As part of his coursework at college, he had corresponded with an inmate on death row. Ultimately, he said that he would not be able legitimately to consider imposing the death penalty. On questioning by defense counsel, Laramie again stated he could not consider imposing the death penalty. The trial court clearly did not err in striking Laramie for cause.

■ While venireperson Hanks said he could consider the death penalty, he also said that there could not be "one doubt" in his mind as to the guilt of the murderer. After a lengthy harangue between Hanks, the prosecutor, and the court regarding the difference between a reasonable doubt and no doubt, Hanks indicated that he could follow the court's instructions. The state moved to strike him for cause on the grounds that he would hold the state to a higher standard of proof. The record indicates considerable confusion on the part of Hanks as to what a "reasonable doubt" is and what would be necessary for the state to prove in order for him to consider the death penalty. Based on the entire examination and the trial court's more favorable position to interpret Mr. Hanks's demeanor and responses, we do not find that the trial court's decision to strike Hanks for cause was not an abuse of discretion.

■ Venireperson Benson initially said that he could consider the death penalty. However, further questioning revealed that he could not consider it in this case. Benson stated that he could not impose the death penalty on anyone who claimed to be innocent, whether they had been through a trial or not. He said he could consider the death penalty for cases involving child molestation, but since this was not that type of case, he could not consider the death penalty in this case. The trial court did not err in striking Benson for cause.

### VIII.

### LIMITING DEFENSE COUNSEL'S QUESTIONING ON VOIR DIRE

Roberts contends that the trial court erred in sustaining the State's objections to certain of defense counsel's questions on voir dire. He also contends that the trial court allowed the state greater opportunities to conduct voir dire than the defense, in that the state was sometimes allowed to ask additional questions after the defense had finished.

■ Control of voir dire, including the nature and extent of the questioning, is within the discretion of the trial judge. *State v. Copeland*, 928 S.W.2d 828, 852 (Mo.1996); *State v. Storey*, 901 S.W.2d 886, 892 (Mo. 1995). Only abuse of discretion and likely injustice justify reversal. *Storey* at 892.

■ Roberts contends he was prejudiced because, as a result of the trial court's rulings, he was unable to obtain necessary information to support possible peremptory strikes. The trial court sustained the state's objection when defense counsel asked a small group of venirepersons whether anyone felt that death was preferable to life in prison

without parole. Roberts claims this question was necessary to determine bias. However, defense counsel stated at voir dire that he felt he "pretty much [had] everybody's view" on whether they could consider a sentence of life without parole or would instead automatically vote for the death penalty. Defense counsel had ample opportunity to voir dire the panel. Disallowing that single question would not and did not result in likely prejudice to Roberts. The trial court did not abuse its discretion in sustaining the state's objection.

■■■ Roberts raises other questions that he believes he should have been allowed to ask. However, the prospective jurors of whom he wished to ask these questions did not serve on the jury. Thus, Roberts cannot show actual prejudice arising from the fact that he could not question those jurors further.

■■■ Finally, Roberts observes that the state had more opportunities to voir dire prospective jurors than the defense. On three occasions, the trial court allowed the state to ask additional questions of particular jurors after the defense had finished death qualification of the small group of the venire panel. In the first instance, the trial court had cut off the state's initial voir dire so as to allow the defense to proceed, but promised the state that it could ask its remaining questions when the defense concluded. In the other two instances, the state was allowed to further question one juror regarding equivocal answers.

Roberts has made no showing how he was prejudiced by this act of the trial court. None of the venirepersons subjected to additional questioning actually sat on Roberts's jury. Roberts made no contention that at any time he had additional questions to ask and was denied the opportunity to do so. Of the six jurors who were further questioned during death qualification, only two were stricken for cause at that point, and as to one of these, the defense agreed.

In short, there is nothing to suggest that Roberts was unable sufficiently to voir dire the panel, that the trial court abused its discretion in sustaining the state's objections, or that Roberts suffered any prejudice because of the trial court's rulings.

The point is denied.

## IX.

## PROSECUTOR'S IMPROPER QUESTIONING ON VOIR DIRE

Roberts contends the prosecutor made a variety of improper comments during voir dire. Defense counsel objected to some of these comments, but the objections were overruled. Roberts claims the trial court erred in doing so. As to those comments to which defense counsel did not object, Roberts argued that defense counsel was ineffective in failing to do so.

To repeat: Control of voir dire, including the nature and extent of the questioning, is within the discretion of the trial judge. *State v. Copeland,* 928 S.W.2d 828, 852 (Mo.1996); *State v. Storey,* 901 S.W.2d 886, 892 (Mo. 1995). Only abuse of discretion and likely injury justify reversal. *Storey* at 892. Ineffective assistance of counsel will be found only where counsels' performance was below the degree of skill, care, and diligence of a reasonably competent attorney, and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). The motion court found no ineffective assistance regarding Roberts's claims. On review, we determine whether the court's findings and conclusions are clearly erroneous. We will reverse the motion court's rulings only if, after a review of the whole record, we are left with the definite and firm impression a mistake has been made. *State v. Taylor,* 929 S.W.2d 209, 224 (Mo.1996).

### A.

### Comments Regarding Certainty of Penalty Phase

Several times during voir dire, the prosecutor purportedly commented on the inevitability of the penalty phase in this case. The

alleged improper commentary, within its proper context, follows:

### 1.

▇▇▇ So the question is we want people that can consider both. I mean, legitimately consider both. Not lip service but make no mistake you're gonna be asked to do this. Okay. It's not just a hypothetical. It is now but later it won't be.

The prosecutor made this statement when questioning persons who had equivocated as to whether they could consider both penalty options. He was trying to stress that, assuming the case reached the penalty phase, the jurors would have to consider the reality of considering imposing the death penalty. The motion court did not err in finding defense counsel not ineffective in failing to object.

### 2.

In questioning venireperson Grothe, the prosecutor said:

Make no mistake, I'm not asking you to do one or the other yet, okay?

... I will at some point ask you, but now I want to know if you and the others can consider both.

Seconds after this comment was made, the prosecutor again said to Grothe, "assuming you're there *in that hypothetical case,* you would be able to [consider the death penalty]?—*you could do that in the proper case?"* Read in the context of the rest of the prosecutor's questioning, the prosecutor's statement is not improper. No objection was necessary.

### 3.

As part of his opening remarks to one small group of veniremembers prior to voir dire, the prosecutor said:

Not all Murder First degree cases are punishable by the death penalty. Only special murder in the first degree cases. Only certain types of murder in the first degree cases are punishable by death. This is one of those where that option will be available to you, assuming you open that first door and assuming—

This statement does nothing more than observe that the state is seeking the death penalty in this case and that option will be available only if the jury finds the defendant guilty and finds aggravating circumstances.

The point is denied.

### 4.

The prosecutor also said:

But, I do want to tell you that, make no mistake about this, I will be standing before you asking you to impose the death penalty.

Defense counsel objected. The prosecutor clarified that he was asking the question in a hypothetical situation. Defense counsel asked the state to rephrase the question. Instead, the trial court asked the venireperson whether he understood that the question as to ability to impose the death penalty was based at this point only on an assumption that the trial reached that point. The venireperson said he understood. To the extent the prosecutor's initial statement may have been improper, the prosecutor's and the trial court's subsequent explanations averted any harm.

The point is denied.

### 5.

The prosecutor said in the context of explaining the trial procedure, that *if* the jury found the defendant guilty and *if* the jury found aggravating circumstances, **then** the jury would have to actually consider whether to impose the death penalty or not. He then said:

And, make no mistake about this as well, ladies and gentlemen, you will assess punishment in this case. The Jury assesses punishment. The Jury imposes the sentence.

In making this statement, the prosecutor attempted to press upon the jury that the question of whether the death penalty should be imposed would be their decision to make, should they reach that point. The prosecutor's statement, in context, was not improper.

Roberts also contends the above statements reflected the prosecutor's opinion that

the penalty phase was inevitable in this case. The statements, when read in context, do not impermissibly reflect the prosecutor's opinion. The prosecutor, in making the challenged statements, sought to determine whether the prospective jurors could actually consider the death penalty if confronted with that choice. The entire context of the voir dire reflects that the prosecutor took pains to differentiate between the theoretical consideration of the death penalty that many people may engage in from time to time in social discussion, and actual consideration of the reality of the imposition of the death penalty each potentially faced if a member of the jury. This is the proper purpose of death qualification voir dire. The trial court did not abuse its discretion in allowing the statements.

The point is denied.

## B.

### Attempting to Arouse Passion

■ The prosecutor asked one of the venirepersons whether she or a loved one in her family had ever been raped or assaulted or murdered. Roberts says the prosecutor, in asking that question, improperly tried to arouse the passions of the venirepersons and defense counsel should have objected. A standard voir dire question in a criminal trial is whether any of the venirepersons or their relatives had been the victim of a crime. Counsel cannot be ineffective for declining to make a meritless objection.

## X.

### FAILURE TO STRIKE PROSPECTIVE JUROR FOR CAUSE

■ Roberts claims that the trial court erred in denying his challenge for cause to venireperson Koontz. Koontz allegedly had strong leanings toward the death penalty and stated he would only give a passing consideration to life without parole. Roberts used a peremptory strike to remove Koontz from the panel.

Section 494.480.4 provides that the qualifications of a juror on the panel from which peremptory challenges by the defense are made cannot constitute grounds for the reversal of a conviction or sentence unless the juror actually served upon the jury. Because Koontz did not serve on the jury, Roberts's claim is without force. *See, e.g., State v. Whitfield,* 939 S.W.2d 361, 369 (Mo. banc 1997); *State v. Richardson,* 923 S.W.2d 301, 310 (Mo. banc 1996); *State v. Gray,* 887 S.W.2d 369, 383 (Mo. banc 1994).

## XI.

### BATSON CHALLENGES

Of the panel of fifty-four prospective jurors left after death qualification, only four African–American jurors remained. The state used its peremptory challenges to remove two of the African Americans, venirepersons Eikerenkoetter and Blanchard. Defense counsel objected, claiming that the state engaged in purposeful racial discrimination in removing Eikerenkoetter and Blanchard, in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The trial court accepted the state's explanations for the strikes and overruled defense counsel's *Batson* objections. Roberts contends that the trial court erred because the state's reasons for removal of Eikerenkoetter and Blanchard were pretextual.

■ In Missouri, the *Batson* challenge is a three-step process. As stated in *State v. Parker,* 836 S.W.2d 930, 939–940 (Mo.1992), the defendant must first raise a *Batson* challenge with regard to venirepersons struck by the state and identify the cognizable racial group to which the venirepersons belong. The state must then provide a reasonably specific and clear race-neutral explanation for the strike. Assuming the state provides an acceptable reason, the burden then shifts to the defendant to show that the state's reasons are merely pretextual and that the strikes are actually racially motivated.

■ A prosecutor's explanation that is reasonably specific and race-neutral will suffice to uphold the strike unless there is an inherently discriminatory intent in the explanation. *State v. Weaver,* 912 S.W.2d 499, 509 (Mo. banc 1995). The trial judge, in assessing the prosecutor's explanations, must eval-

uate the susceptibility of the particular case to racial discrimination, the prosecutor's demeanor, and the explanation itself. *Id.* Crucial to the analysis is whether the state declined to challenge similarly situated white venirepersons. *Id.* This Court, on review, will set aside the trial court's finding only if such finding is clearly erroneous. *Id.*

## A.

### Venireperson Eikerenkoetter

■ In defense of his strike of Eikerenkoetter, the prosecutor said:

I didn't care for his view on the death penalty. I had a choice to make among several people that to narrow it down as to those that were supportive and not supportive on the death penalty and he was one that said he was not strongly supportive of the death penalty. And he didn't speak much. I just didn't get to know much about him. He didn't answer any questions. He didn't seem to volunteer much information. He's a nurse and I tend to strike people in the medical field because of all the doctors that are gonna be testifying. That was another consideration that I had.

The trial court found this sufficiently race-neutral reason to support the peremptory strike. Defense counsel challenged this finding, claiming that Eikerenkoetter supported the death penalty more than some white persons who were left on the panel. The trial court countered that the prosecutor's explanation that he also struck Eikerenkoetter because he was a nurse was sufficient grounds to support the strike. The defense claims this too was pretextual because the state did not strike a Caucasian juror whose husband worked as a physician's recruiter.

The trial court's ruling as to venireperson Eikerenkoetter was not clearly erroneous. Eikerenkoetter was employed as a nurse and therefore, by necessity, had medical training. The prosecutor's explanation was race-neutral, and Roberts has failed to demonstrate that similarly situated white jurors were not struck or that the prosecutor's explanation was otherwise pretextual. There was no *Batson* violation.

## B.

### Venireperson Blanchard

■ The prosecutor initially tried to strike Blanchard for cause during the death qualification portion of voir dire. The trial court overruled the prosecutor's motion at that time. The prosecutor then used a peremptory strike to remove Blanchard because "she could not do" the death penalty. During death qualification, Blanchard told both the state and the defense that while she could consider the death penalty, she would not be able to return a verdict of death under any circumstances. This is a sufficiently race-neutral reason to uphold the state's peremptory strike, and Roberts has not shown that this explanation is any way pretextual. The entire record of Blanchard's voir dire indicates that she would not be able legitimately to consider the death penalty—in that even if she considered the death sentence, she would never return a verdict recommending a death sentence. The trial court did not clearly err in upholding the state's peremptory strike of Blanchard.

The points are denied.

## XII.

## PAY FOR CHILD SUPPORT CARE FOR JURORS

■ Roberts argues that the trial court erred in denying his motion to provide child care for single jurors with dependent children. Three venirepersons indicated that they would have child care problems if required to serve on a sequestered jury. Roberts maintains that failure to provide assistance for child care results in a "systematic exclusion of women, blacks and those of socio-economic status in violation of the fair cross-section requirement of the Sixth Amendment and Equal Protection Clause."

The court initially deferred ruling on the motion, in order to see whether it would even be necessary. Later, when Roberts asked the court to reconsider the motion, in light of the responses of certain venirepersons, the trial court stated it had no authority to provide such assistance. Roberts asserts that

the trial court does have the authority, citing to section 550.120.2(4), which defines costs as "[a]ny other expense directly related to the trial and prosecution of such criminal charge found necessary by the trial judge hearing the case."

It is not constitutionally required that the courts budget child care for jurors. *State v. Whitfield,* 837 S.W.2d 503, 510 (Mo. banc 1992). "The decision not to provide child care is a rational decision, facially neutral with regard to race and gender. As there is no intention to discriminate, the disproportionate impact on minorities and women is not sufficient to violate the equal protection clause of the Fourteenth Amendment, nor Article I, section 2 of the Missouri Constitution." *Id.*

The point is denied.

## XIII.

## INSTRUCTIONAL ERROR–GUILT PHASE

### A.

### Felony Murder Instruction

Roberts asserts that the trial court erred in refusing to submit a felony murder instruction. The court did submit a second degree murder instruction; that instruction sufficiently permitted the jury to find that Roberts did not deliberate prior to killing Ms. Taylor. This was Roberts's theory of the case. Roberts was not prejudiced by the absence of a felony murder instruction. *See, e.g., State v. Wise,* 879 S.W.2d 494, 517 (Mo. banc 1994); *State v. Six,* 805 S.W.2d 159, 164 (Mo. banc 1991).

### B.

### Diminished Capacity Instruction

Roberts also claims that the trial court erred in refusing to submit a diminished capacity instruction. The trial court would not allow the submission of both the general converse instruction, MAI–CR3d 308.02, and the instruction regarding mental disease or defect negating a culpable mental state, MAI–CR3d 308.03. Faced with a choice, Roberts chose the former. Roberts believes he was entitled to both.

Note on Use 8 of MAI 308.03 states that the use of that instruction does not prevent a defendant from also using a converse instruction based on MAI–CR 308.02. However, such converse may not include the mental element of the crime that is conversed in the instruction based on 308.03. In Roberts's case, both of the proffered instructions conversed the element of deliberation. Therefore, the Notes on Use advise that both instructions could not be given. The trial court did not err in refusing to submit both instructions.

The point is denied.

### C.

Roberts's other claim of instructional error was not preserved for appellate review and does not facially present substantial grounds for believing that manifest injustice resulted. Therefore, we decline to exercise our discretionary review under Rule 30.20.

## XIV.

### PENALTY PHASE INSTRUCTION

The trial court overruled defense counsel's motions and objections challenging the validity of the MAI–CR patterned penalty phase instructions, which Roberts claims fail to properly instruct the jury on the role of aggravators and mitigators. Roberts asserts that the trial court violated his constitutional rights to individualized sentencing, due process, and freedom from cruel and unusual punishment.

Where an applicable MAI–CR instruction exists, the court is required under Rule 28.02 to submit that instruction. The applicable MAI–CR instructions sufficiently address the jury's consideration of mitigating circumstances, and the trial court properly submitted the MAI instructions to the exclusion of defendant's non-MAI instructions regarding mitigators. *See, e.g., State v. Kinder,* 942 S.W.2d 313 (Mo. banc 1996); *State v. Richardson,* 923 S.W.2d 301, 325 (Mo.1996); *State v. Tokar,* 918 S.W.2d 753, 771 (Mo. 1996); *State v. Chambers,* 891 S.W.2d 93, 109

(Mo. banc 1994); *State v. Wise,* 879 S.W.2d 494, 518 (Mo.1994).

The point is denied.

## XV.

### VICTIM IMPACT EVIDENCE

Despite defense counsel's objections, the trial court allowed the state to present victim impact evidence during the penalty phase. In addition to the testimony of two friends of the victim, the state introduced photographs of the victim with family and friends, plus a number of handcrafted items made by the victim.

Section 565.030.4, RSMo 1994, provides that at the penalty phase, the trial court, within its discretion, may allow evidence concerning the murder victim and the impact of the crime upon the family of the victim and others. Roberts contends that this statute is unconstitutionally vague and overbroad as it in no way limits what evidence might come in and, thus, increases the risk that the death penalty will be imposed due to passion, prejudice, or other arbitrary factors.

Under both the United States and Missouri Constitutions, victim impact evidence is admissible in Missouri. *State v. Parker,* 886 S.W.2d 908, 926 (Mo. banc 1994). The state may properly find that, at the sentencing phase, the jury should have before it evidence of specific harm caused by the defendant, in order that the jury meaningfully may assess the defendant's moral culpability and blameworthiness. *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991). "The state is permitted to show the victims are individuals whose deaths represent a unique loss to society and to their family and that the victims are not simply 'faceless strangers.'" *Id.*

Roberts contends there is no limit to the evidence that might come in under section 565.030.4, thus risking that the death penalty will be imposed as a result of passion. However, as this Court has recognized in numerous cases, the Due Process Clause of the Fourteenth Amendment of the United States Constitution provides such a limit: victim impact evidence may not be so unduly prejudicial that it renders the trial fundamentally unfair. *State v. Kreutzer,* 928 S.W.2d 854, 877 (Mo. banc 1996); *State v. Parker,* 886 S.W.2d at 927; *State v. Wise,* 879 S.W.2d 494, 516 (Mo. banc 1994). The evidence in this case was not unduly prejudicial, nor was Roberts's trial rendered fundamentally unfair.

The point is denied.

## XVI.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Roberts timely filed a Rule 29.15 motion, claiming ineffective assistance of counsel. Roberts now contends that the motion court clearly erred in overruling his motion. The claims we address here are colorable and are those not previously discussed, *supra.*

To repeat: To prevail on a claim of ineffective assistance, Roberts must show that his counsels' performance fell below the degree of skill, care, and diligence of a reasonably competent attorney, and that the deficiency prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Counsel's performance is presumed competent. *Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66. Furthermore, counsel's actions that constitute sound trial strategy are not grounds for ineffective assistance claims. *State v. Whitfield,* 939 S.W.2d 361, 369 (Mo. banc 1997). Even if Roberts demonstrates error on the part of his counsel, he must also show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. If Roberts fails to satisfy either the performance or the prejudice prong, this Court need not even consider the other. *State v. Whitfield,* 939 S.W.2d at 369.

The motion court found no ineffective assistance regarding Roberts's claims. On review, we determine whether the court's findings and conclusions are clearly erroneous. We will reverse the motion court's rulings only if, after a review of the whole record, we are left with the definite and firm impression

a mistake has been made. *State v. Taylor*, 929 S.W.2d 209, 224 (Mo.1996).

■ Roberts claims that his counsel was ineffective for failing to investigate and present mitigating evidence during the penalty phase. Specifically, Roberts contends that his counsel should have elicited additional testimony from Roberts's mother, Patsy Roberts, regarding his early childhood development and the behavioral problems he presented throughout his childhood.

Part of defense counsel's strategy at penalty phase was to put Mrs. Roberts on the stand in hopes that her emotional testimony of her love for her son would engender sympathy from the jury, while expert witnesses would testify as to Roberts's developmental and behavioral problems. Defense counsel declined to go into a lengthy examination of Mrs. Roberts regarding her son's childhood because he did not want to emphasize the negatives in the family relationship. When counsel believes a witness's testimony will not unequivocally support his client's case, counsel's decision to not call the witness is a matter of trial strategy. *State v. Richardson*, 923 S.W.2d 301, 328 (Mo. banc 1996). Counsel also felt that Dr. Vlietstra, a child psychologist, would be a more credible witness regarding Roberts's alleged developmental and behavioral problems.

Moreover, from reviewing Mrs. Roberts's testimony at the Rule 29.15 hearing, there is no reason to believe that her further testimony would have aided Roberts's cause. Much of what she said was cumulative of the evidence reported in the exhibits and testified to by experts, including Dr. Vlietstra. Her testimony was also at times inconsistent with that of the experts. For example, Mrs. Roberts denied that her husband ever sexually abused her son. Mrs. Roberts's testimony was also potentially damaging, in that she admitted that her son could be violent and overpowering when angry, that he was difficult to control, and that he had raped his five-year-old sister and refused to take responsibility for the act.

Based on this record, we do not believe the motion court clearly erred in finding that Roberts's counsel was not ineffective in not eliciting further testimony from Roberts's mother regarding his background. Defense counsel made a reasonable strategic decision that such testimony could potentially do more harm than good.

The point is denied.

## XVII.

## PROSECUTORIAL MISCONDUCT

Roberts submits that the prosecutor engaged in deliberate acts of prosecutorial misconduct, depriving him of his rights to due process and freedom from cruel and unusual punishment. According to Roberts, the prosecutor improperly commented on his right to due process and right to counsel.

■ The touchstone of due process in cases involving prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). The court seeks to ensure that the defendant receives a fair trial, not to punish society at large for the prosecutor's misconduct. *Id.* Mistrial is a drastic remedy to be employed in only the most extraordinary circumstances. *State v. Johnson*, 901 S.W.2d 60 (Mo. banc 1995). Such a decision is left to the discretion of the trial court because the trial court is in the best position to observe the impact of the problematic incident. *State v. Parker*, 886 S.W.2d 908 (Mo. banc 1994).

### A.

### Comment on Motion to Suppress

■ Roberts claims his due process rights were violated when the prosecutor made a passing comment referencing Roberts's motion to suppress his confession. The prosecutor, while examining a police detective, said the following:

"And you were pointed to your previous motions testimony.... And I think—I don't know if you were shown the transcript or not. Well, let's mark it as State's Exhibit 243. Transcript, Motions to Suppress." Defense counsel immediately objected and requested a mistrial. The trial court refused to grant a mistrial, but did admonish the prosecutor to make sure he said nothing

further about a motion to suppress. The prosecutor made no further mention of the motion to suppress.

This inadvertent error on the part of the prosecutor hardly constitutes extraordinary circumstances that require the drastic remedy of a mistrial. The trial court did not err in overruling Roberts's motion.

Roberts also contends that his counsel was ineffective for not preserving this issue in his motion for new trial. This is incorrect. Counsel did include this issue in the motion for new trial.

## B.

### Consultation With Attorney

■ Roberts also contends that the prosecutor made improper reference to his right to counsel and whether he had consulted with counsel prior to his mental evaluations. During examination of the state's expert, Dr. Rabun, the prosecutor said:

> When defendant talked with you, Dr. Rabun, about facts of the case for your mental status, do you know at that time whether he knows that your exam and findings will be mentioned in court?
>
> A: (by Dr. Rabun): That's correct.
>
> Q: So they know that you're examining him after speaking with his lawyer?

Defense counsel objected, approached side bar, and requested a mistrial. The prosecutor tried to explain his statement and indicated he would not ask any further questions along those lines. The trial court overruled the motion for a mistrial, and the question was withdrawn. The trial court sustained defense counsel's objection and instructed the jury to disregard the last question. The prosecutor made no other references to Roberts's right to consult with counsel.

The trial court provided an adequate remedy for the prosecutor's misstep. Furthermore, Roberts has made absolutely no showing of prejudice arising from the prosecutor's comment. Again, the trial court did not err in declining to declare a mistrial.

## XVIII.

The remaining points Roberts raises deal with issues this Court has recently decided against his position or issues which are repetitive or border the frivolous. We will not burden the pages of the Southwestern Reporter 2d repeating previous, recent decisions or reiterating legal conclusions and holdings made elsewhere in the opinion. The remaining points are, therefore, affirmed without a discussion that would provide no jurisprudential value. Rule 30.25(b) and Rule 84.16(b).

## XIX.

### INDEPENDENT REVIEW

■ Section 565.035.3, RSMo, requires this Court to determine

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant.

## A.

Having reviewed the record, we find no evidence that the sentence of death was imposed due to passion, prejudice, or any other arbitrary factor.

## B.

■ We next review as to whether there was sufficient evidence to support the jury's finding of the following statutory aggravating circumstances:

1) That Roberts murdered Mary Taylor for the purpose of receiving money or any other thing of monetary value;

2) That the murder of Mary Taylor involved depravity of mind, in that Roberts committed repeated and excessive acts of

physical abuse upon Mary Taylor and the killing was therefore unreasonably brutal and, as a result thereof, the murder was outrageously and wantonly vile, horrible and inhuman.

There is more than ample evidence supporting both of these aggravators. The evidence shows that Roberts went to Taylor's home to obtain property he could sell or exchange for crack cocaine and, in fact, did take money and property from the victim's residence. As to the brutality of the murder, Roberts struck the victim numerous times with a hammer, kicked her, choked her, stabbed her, slashed her, and finally tried to drown her.

### C.

In considering whether the death sentence imposed in this case is proportionate, we consider the death sentence imposed in other similar cases. Roberts's case is similar to other cases in which the defendant invades a home and murders the occupant in order to obtain something of value. *State v. Hunter*, 840 S.W.2d 850 (Mo. banc 1992); *State v. Ervin*, 835 S.W.2d 905 (Mo. banc 1992). Appellant's case is also similar to those in which the defendant used multiple means to cause the victim's death. *State v. Lingar*, 726 S.W.2d 728 (Mo. banc 1987). Considering the crime, the strength of the evidence, and the defendant herein, we do not find Roberts's sentence disproportionate to that that imposed in other cases.

### XX.

The judgment of guilt for first degree murder, the sentence of death and the order overruling appellant's Rule 29.15 motion are affirmed.

All concur.