**STATE of Missouri, Respondent,**

v.

**Fred RAY, Jr., Appellant.**

**No. WD 52109.**

Missouri Court of Appeals,
Western District.

March 11, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied April 29, 1997.

Application to Transfer Denied
June 17, 1997.

Jonathan L. Laurans, James F. Speck, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Jefferson City, Philip M. Koppe, Assistant Attorney General, Kansas City, for respondent.

Before SMART, P.J., and SPINDEN and ELLIS, JJ.

ELLIS, Judge.

Fred Ray was convicted by a Lafayette County jury of second degree murder, § 565.021,[1] and armed criminal action, § 571.015.1. He was sentenced to concurrent terms of life and ten years imprisonment, respectively. Ray appeals.

On Monday night, April 17, 1995, Fred and Connie Ray's sixteen year old daughter, Lora, ran away from home. Gina Nettleson, a friend of Lora's, told the Rays to look for her at Howie Adams' house, a reputed drug house. The Rays went to the Adams' house, where they met Brian "Howie" Adams, although Howie did not identify himself at that time. The Rays asked Howie if he knew where their daughter was. He claimed he did not. A number of other young men were standing around, and Connie asked them if they knew where Lora was. Some of the boys made rude and lewd comments to Connie. She recognized one of the speakers as Lincoln Bainbridge and admonished him for the comments. One boy finally told the Rays their daughter had been at the house earlier, but had left with David DeCamp. Mr. How-

---

1. All references are to RSMo 1994, unless otherwise noted.

ard Adams, Howie's father, came outside and asked Howie if he had any information concerning Lora's whereabouts. When Howie said he did not, the Rays left.

The next day, the Rays found Lora at David DeCamp's and admitted her into a drug rehabilitation program. When the Rays got home from the hospital, they noticed some boys in a red Mustang sitting across the reservoir park watching their house for over an hour. The Rays learned the Mustang belonged to Lincoln Bainbridge, one of the young men at the Adams' house the night before.

On Wednesday, Connie went to her daughter's high school to advise them of Lora's absence. She was followed by a red Mustang. The red Mustang also followed her to church and to the grocery store, where it parked next to her. In the grocery store, two men in their twenties watched Connie as she shopped from aisle to aisle. Although these men were ahead of her at the checkout stand, they offered to let her to go first and went to the next checkout lane. After checking out, Connie went to talk to the manager of the store about her daughter. When she left the store, the Mustang was gone.

When she arrived at home, Connie called Ray at work and told him she had been followed by some boys in a red Mustang. As soon as Ray could leave work, he drove to Mr. Adams' house to solicit his help in getting the boys to leave his family alone. Because he did not see a vehicle in the Adams' driveway, Ray did not stop. He went back to the Adams' that evening, but no one answered the door. However, Ray talked to Mr. Keith Holt, a neighbor and relative of the Adams', who did not know when Mr. Adams would be back.

Later that evening Ray received a phone call from someone who identified himself as "Eric Smith." The caller asked Ray, "What the hell you doing over at this house?" Ray asked, "What house?" The speaker replied, "You know damn good and well what house." Ray said his family just wanted to be left alone. The caller said he would "do" Ray and his family. Ray called the police to report the call. The police told Ray they would send some officers to his house. Ray

armed his son with a shotgun and himself with a pistol, and put a rifle by the door. Sometime later, Ray received another call from someone who said, "you are dead." Ray again called the police to report the call.

When the police arrived, Ray asked them to stay to protect his family. The police told Ray they were aware of the drug house, and "had warrants out for the inhabitants' arrest." The police told Ray they did not think the boys would hurt the family, but might do property damage. After the police left, Ray called his 22 year old son, Scott. When Scott arrived, they discussed their options and decided to try to get Mr. Adams' help. Just as Ray and Scott were about to leave, they decided to take a gun for protection because they were going to a drug house. Ray put the pistol in the waistband of his pants.

The majority of the foregoing testimony was excluded at trial. The case, as presented to the jury, contained the following evidence. On April 19, 1995, Ray received a telephone call at work from his wife advising him of certain upsetting "events" that transpired that day. Upon leaving work, Ray proceeded to the residence of Mr. Howard Adams to engage his help in desisting these "events." Ray believed Mr. Adams would be cooperative in this matter because he had been helpful in a past situation. When Ray did not see Mr. Adams' automobile at the residence, he did not stop.

Later that evening, at approximately 8:00 p.m., Ray drove to Mr. Adams' home in a second attempt to engage his help. Again, Mr. Adams was not home, but Ray spoke to Mr. Keith Holt, a neighbor and relative of Mr. Adams. Mr. Holt advised Ray that Mr. Adams was not home, but would probably be home in the morning.

At approximately 11:00 p.m. that evening, Ray called the Lafayette County sheriff's department. When the officers arrived at the Ray's home, Ray was carrying a rifle over his shoulder and a revolver in the front of his pants. The officers detected an odor of alcohol on Ray's person. Ray unloaded his weapons at the officers' request. Ray advised the officers of his concerns and fear of a Mr. Eric Smith. The officers advised

Ray to call the sheriff's department if he had any other concerns, but asked him to let them handle the situation.

Believing the officers were of no real help, Ray rearmed his weapons, and told his middle son, Shane, to call his oldest son, Scott, for assistance. When Scott arrived, Ray informed him of the day's events. The two men decided they would make another effort to find Mr. Adams and solicit his help with the "events." Just before leaving his house, Ray grabbed his pistol and put it in the back of his pants. At the Adams' residence, Ray and Scott rang the doorbell. Howie Adams, the son of Mr. Howard Adams, and his friend, Ryan Stebbins, answered the door.

At this point the State's and the defendant's renditions of the events differ dramatically. Ryan, Howie's friend, testified the following events transpired after Ray and Scott arrived at the Adams' house. Ray asked Howie if he knew who he was and whether the boys were going to let him in, or whether he had to come through the hole in the screen. Once inside, Ray angrily shook his fist and finger in Howie's face, asking the boys to leave his family alone. Ray stated that he was there to get his ass kicked and that the boys were lucky they were not of age, or he would kick their ass. When Ryan told Ray they "had no fucking problem with [him]," Ray became enraged by the use of the epithet. Ray then asked Howie how old he was. Upon discovering that Howie was 20, Ray began swinging his fists at Howie. In an effort to avoid the blows, Howie retreated into the living room, but really didn't have anywhere to run. Ryan yelled at Ray to stop.

Ray pulled the pistol from his waistband, placed the gun flush with Howie's forehead at the bridge of his nose and, after a slight pause, shot him. Ryan ran to the corner of the kitchen and attempted to conceal himself. Ray pointed the gun at Ryan, who begged not to be shot. Scott asked his father what he was doing. Ray stated that he was already going to prison and might as well shoot Ryan, too. Scott instructed Ray to put the gun down. Ray took the bullets out of the gun and set it on the counter. Ray and Scott told Ryan to call the police. Scott

attempted to stop Howie's bleeding with towels and Ray performed CPR on Howie.

Ray, on the other hand, testified the following occurred at the Adams' house. When Howie and Ryan answered the door of the Adams' residence, Ray asked to see the man of the house. When he learned that Mr. Adams was not home, he asked if there were any more parents at home. Because there were not, Ray asked Howie if they could talk. Howie let Ray and Scott into the house. Ray repeatedly asked Howie and his group to leave his family alone. Howie then pushed Ray in the chest. Ray swung at Howie, and they began to wrestle. At some point, Scott broke up the fight. Ray realized the gun had slipped down the back of his pants, so he reached around and pushed it back up into his belt. Ray again asked Howie and his group to leave his family alone and told Howie he would protect his family however he had to. While saying this to Howie, Ray pulled the gun out of his pants to show that he was willing to protect his family. As he was bringing the gun around to show it to Howie, his arm was hit and the gun went off. Ray began to stumble around asking, "who hit my arm." Ryan stepped back begging Ray not to shoot him. Ray told Ryan he was not going to shoot him, and tried to hand the gun to Ryan. Ray then emptied the bullets from the gun and set it on the table. Ray and Scott told Ryan to call an ambulance. Scott got towels to stop the bleeding and Ray administered CPR.

Ray repeatedly stated that the shooting was an accident. When the sheriff's deputies and paramedics arrived at the Adams' residence, Ray was covered in blood. As he was taken into custody, he continued to claim the shooting was an accident. The single gunshot to Howie's head proved fatal. An autopsy revealed soot in the wound itself indicating the wound was a "contact gunshot wound," meaning the gun muzzle was flush against Howie's forehead when the gun was fired.

Prior to trial, the State moved the court to preclude the defense from mentioning narcotics during voir dire and opening statements, and from introducing any evidence of narcotics at trial. The State argued that

evidence of narcotics would be relevant only if Ray was claiming self-defense or was, himself, on drugs at the time of the shooting. In return, defense counsel argued that some evidence of narcotics was essential to explain why Ray was armed when he went to the Adams' residence and to rebut the State's evidence on the intent element of second degree murder. The court sustained the State's motion.

Following voir dire, the court heard further argument on the State's motion. At that time, the State orally expanded its motion to further exclude any evidence of the events that transpired the day of and immediately preceding the shooting, including testimony that Ray's wife was harassed by some boys in a red Mustang, and that his family had received threatening telephone calls. The State argued that evidence of such "bad acts" was irrelevant, inflammatory, and highly prejudicial.[2] The trial court sustained the State's motion on relevancy grounds and precluded the defense from mentioning narcotics, the harassment, or the threatening phone calls in opening statements.

■■■■ Prior to the State's opening argument, the defense made an offer of proof of the excluded evidence.[3] The offer of proof consisted largely of Connie and Fred Ray's testimony regarding their initial meeting with the Adams on Monday night, the harassment by the young men in the red Mustang on Tuesday and Wednesday, and the threatening telephone calls on Wednesday night.[4] Defense counsel argued the proffered evidence was relevant in the following respects:

> ... to negate the required mental state in the charge of murder in the second degree, and that if the evidence is not presented, that the evidence that the jury hears will be confusing, misleading, and will invite false and incorrect inferences, because it will not explain why Fred Ray went to the house, why he was upset, why he had a gun with him. And it will invite inferences that will be, I suggest, favorable to the State without giving the defendant the opportunity to explain why he went there and to rebut those inferences.

The State did not make any individual objections to the offer of proof, thus no specific rulings were made as to the admissibility of the testimony. Nor did the State assert a general objection to the offer of proof on relevancy grounds. The trial judge ruled that the evidence was irrelevant and prejudicial.

---

**2.** The Prosecuting Attorney asserted:

I need to expand my motion in limine through oral means by suggesting if the defense counsel indicated they are going to use some kind of exhibit that talks about things that happened maybe even three days before this event whereby they claim the defendant's wife had been followed by an individual named Lincoln Bainbridge, or at least they had seen his car, that there were threatening phone calls by individuals named Eric Smith or Lincoln Bainbridge or other individuals who are known to hang around with perhaps the victim, and maybe even at times the victim may have been present during these things ... if the victim made these kinds of threats three days before, two days before, it has no relevance in this case.

**3.** "Where an objection to the proffered evidence is sustained, the party offering the evidence must make an offer of proof demonstrating its materiality and relevancy in order to preserve the matter for appellate review." *State v. White*, 835 S.W.2d 942, 947 (Mo.App. E.D.1992). The offer of proof must present facts which are specific and sufficiently detailed to establish the admissibility of the tendered evidence. *State v. L. R.*,

896 S.W.2d 505, 509 (Mo.App. S.D.1995). The preferred method is to put the witness on the stand and elicit the testimony out of the jury's hearing by asking questions of the witness. *State v. Jones*, 919 S.W.2d 12, 14 (Mo.App. E.D.1996). Questioning the witness, outside the jury's presence, best enables the trial court to intelligently rule upon the admissibility of the evidence. *State v. L. R.*, 896 S.W.2d at 509.

**4.** Defense counsel also made a narrative offer of proof as to what Scott and Shane Ray, and Gina Nettleson would testify. Defense counsel advised the court that Scott Ray would corroborate Ray's testimony about: (1) the reasons for going to the Adams' house, (2) that taking the gun was an afterthought, and (3) that there was no discussion of retaliation or teaching a lesson to the young men on the way to the Adams'. Shane Ray would corroborate Ray's testimony about the events that occurred at the Ray's residence after Ray's 8:00 p.m. visit to the Adams' house. Finally, Gina Nettleson would testify she told the Rays that the Adams' house was a drug house where their daughter got drugs, that she identified the red Mustang as Lincoln Bainbridge's car, and that it sat outside the Ray's house for nearly two hours.

Defense counsel then made an alternate offer of proof consisting of the evidence developed in the original offer of proof minus any evidence of drugs. The State specifically objected to the alternate offer of proof claiming it contained prejudicial and irrelevant evidence.

 The court sustained its original ruling on the State's motion. Based on this ruling, defense counsel reserved his opening statement until the close of the State's evidence. At the close of the State's evidence, defense counsel renewed his request to introduce the excluded evidence.[5] The court maintained its ruling on the motion in limine.

Following trial, the jury convicted Ray of second degree murder, § 565.021, armed criminal action, § 571,015.1, and unlawful use of a weapon, § 560.011.[6]

On appeal, Ray contends the court erred in rejecting his offer of proof and precluding him from mentioning in opening statement and cross-examination, or presenting during trial, the following evidence:

a) two evenings prior to the shooting, Ray learned his daughter, who had run away from home, had been frequenting a drug house filled with illicit narcotics;

(b) upon going to the victim's house to inquire as to his daughter's whereabouts, Connie Ray was subjected to lewd and juvenile comments by the victim and a number of young men at the house;

(c) Ray's daughter was located the next day and placed into drug rehabilitation;

(d) after the first visit to the victim's home, inhabitants of the house staked out Ray's residence, subjected Ray's wife to verbal and physical harassment, and made telephone threats to Ray's family;

(e) on the night of the shooting, when the police came to Ray's residence in response to the threatening telephone calls he had received, they informed him that the Adams' house was the subject of a narcot-

ics investigation and that arrest warrants were out for its inhabitants; and,

(f) Ray's sole intent in bringing the gun to the victim's house was for protection, if necessary, because the house was inhabited by unruly teenagers and contained illegal drugs.

The trial court enjoys broad discretion in determining the relevancy of evidence. *State v. Matheny*, 860 S.W.2d 837, 838 (Mo.App. E.D.1993). The relevancy of evidence depends upon whether the evidence tends to confirm or refute a fact in issue or to corroborate evidence which is relevant and pertains to the primary issue in the case. *State v. Raine*, 829 S.W.2d 506, 510 (Mo.App. W.D. 1992). While we generally will not interfere with the court's ruling on the admission or exclusion of evidence, we will do so when there exists a clear showing of abuse of that discretion. *State v. Harlston*, 565 S.W.2d 773, 782 (Mo.App. E.D.1978).

In order to make a submissible case of second degree murder against Ray, the State had to show he **knowingly** caused Howie's death. § 565.021.1(1). A person *"knowingly"* causes the death of another if "he is aware that his conduct is practically certain" to cause death. § 562.016.3(2). It is undisputed that Howie was killed at close range by a gunshot fired from a pistol Ray was holding. Hence, the pertinent question presented is whether Ray intentionally fired the gun. *See State v. Wolford*, 754 S.W.2d 875, 879 (Mo.App. W.D.1988).

 Ray's defense was that the shooting was an unfortunate and **unintentional** accident. "Accidental homicide involves an unintentional taking of a human life." *State v. Miller*, 772 S.W.2d 782, 784 (Mo.App. S.D. 1989) (emphasis added). The jury was, therefore, obligated to evaluate Ray's testimony that the shooting was accidental as a question of whether the State carried its burden in proving that the shooting was in-

---

5. A ruling on a motion in limine is interlocutory in nature, and is subject to change during trial. *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992). Thus, in order to preserve the issue for appellate review, the proponent of the evidence must present the excluded evidence at trial, thereby giving the trial court an opportunity to

reverse its ruling once the proffered evidence is put in the context of the entire trial. *Id.*

6. Ray does not appeal his conviction for unlawful use of a weapon or his sentence of three years imprisonment on this count.

tentional. *See State v. Branch,* 757 S.W.2d 595, 599 (Mo.App. E.D.1988).[7]

Direct evidence of a particular culpable mental state is rarely available. *State v. Smith,* 891 S.W.2d 461, 466 (Mo.App. W.D. 1994); *State v. Turnbough,* 876 S.W.2d 19, 21 (Mo.App. E.D.1994). "Intent is a state of mind and it may be inferred from all the circumstances." *State v. Holt,* 758 S.W.2d 182, 186 (Mo.App. E.D.1988). It may be demonstrated with evidence of, and inferences from, the defendant's conduct before the act, the act itself, and the defendant's conduct after the act. *State v. Johnston,* 868 S.W.2d 226, 228 (Mo.App. W.D.1994).

■ The State contends that Ray's "specific reasons for going to Adam's house, and his reasons for arming himself, were essentially irrelevant to [the defense of accident]." The evidence of the events that transpired during the forty-eight hours prior to the shooting, if believed, tends to explain why Ray went to the Adams' house, why Ray felt the need to arm himself, and to corroborate Ray's claim that the shooting was accidental. Thus, it was probative of the issue of intent.

In order to negate the intent element of second degree murder and prove accident, Ray needed to be able to sufficiently explain his reason for carrying a gun with him on the night of the shooting. In an effort to explain his actions, the defense sought to introduce the following evidence. On Monday night, April 17, 1995, the Ray's sixteen year old daughter ran away from home. One of her friends advised the Rays to look for her at Howie Adams' house, a reputed drug house. Acting upon this information, the Rays went to the Adams' house, where they met Howie Adams and his large group of friends, for the first time. It was also at this time that the Rays met Howie's father, Mr. Howard Adams, who assisted them in discovering their daughter's whereabouts.

■ The defense also sought to introduce evidence that on Tuesday, April 18, some young men in a red Mustang, which the Rays were told belonged to Lincoln Bainbridge, one of the young men at the Adams' house on Monday night, watched the Ray's house from across the street for over an hour, and the next day followed Connie on her errands to the high school, the church and the grocery store. The defense further sought to introduce evidence of the two threatening telephone calls received by the Rays, just hours before the shooting. As the offer of proof reflected, the first threatening telephone call asked Ray, "what the hell [he] was doing over at this house?" and threatened to "do" Ray and his family. It was after receiving this phone call that Ray called the police and armed himself. The second threatening phone call advised Ray, "you are dead."

Evidence that Ray believed his family was being harassed and threatened by young men connected with the Adams' residence explains why he went to the Adams' house twice on the day of the shooting in search of Mr. Howard Adams, and also why Ray brought a weapon with him on the third and final visit. In the absence of any of this evidence, Ray had only his word to support his claim that he possessed the gun for protection and that the shooting was an accident. The probative value of this evidence clearly outweighs any prejudicial effect it may have had on the State's case. The trial court abused its discretion in excluding this evidence as it was highly relevant to Ray's claim of accident and probative of Ray's intent on the night of the shooting.

The defense also sought to introduce Connie Ray's testimony that Gina Nettleson told her the Adams' house was a reputed drug house and Ray's testimony that a sheriff's deputy told him the Adams' residence was the subject of a narcotics investigation, pursuant to which arrest warrants had been issued for its inhabitants. Because the court excluded all evidence concerning narcotics, Ray and Connie were precluded from testifying about these statements. Not all out-of-court statements are hearsay which must be excluded unless shown to fall within a recognized exception. *State v. Foust,* 920 S.W.2d 949, 954 (Mo.App.E.D.1996). "A statement

7. Where the evidence of accident refutes the essential elements of the offense as set out in the verdict director, a specific accident instruction is not necessary. *State v. Young,* 844 S.W.2d 541, 549 (Mo.App. E.D.1992).

offered to explain the subsequent conduct of one who heard the statement is not inadmissible hearsay." *Id.*[8] The statements were not offered to prove the Adams' residence was a drug house, but to explain why Ray took a gun there the night of the shooting. While the contested statements may be somewhat prejudicial to the State, this prejudice is not wholly disproportionate to the value and usefulness of the offered evidence in establishing Ray's state of mind and reason for arming himself. *State v. Jones,* 835 S.W.2d 376, 380 (Mo.App. E.D.1992). The court abused its discretion in excluding these statements.

 Nonetheless, the exclusion of relevant and admissible evidence is not always reversible error. *State ex rel. Missouri Highway & Transp. Comm'n v. Buys,* 909 S.W.2d 735, 739 (Mo.App. W.D.1995). We will not disturb the trial court's ruling unless the abuse resulted in prejudice to the defendant. *State v. White,* 835 S.W.2d 942, 947 (Mo.App. E.D.1992). "Error committed in a criminal case is presumed prejudicial, but that presumption is not conclusive and may be rebutted by the facts and circumstances of the case." *Tune v. Synergy Gas Corp.,* 883 S.W.2d 10, 22 (Mo. banc 1994). However, where the court is convinced that the error contributed to the result reached by the jury, the judgment should be reversed. *State v. Baker,* 741 S.W.2d 63, 67 (Mo.App. W.D. 1987). Such is the case here.

 "The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky,* 476 U.S. 683, 688, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (citing *Strickland v. Washington,* 466 U.S. 668, 684–85, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984)). "The denial of the opportunity to present relevant and competent evidence negating an essential element of the [S]tate's case may, in

some cases, constitute a denial of due process." *State v. Copeland,* 928 S.W.2d 828, 837 (Mo.1996). In this case, we have little trouble concluding that the blanket exclusion of the proffered evidence depicting Ray's state of mind on the night of the shooting deprived him of a fair trial.

The court's exclusion of the "events" leading up to the shooting enabled the State to portray Ray as a cold-blooded killer who, on the evening of the shooting, made two preliminary trips to the Adams' house and then, on the third and final visit, carried with him a concealed firearm with which he shot Howie.[9] The State further took advantage of the exclusion of this evidence by suggesting that the jury infer Ray's intent to hurt someone from his mere possession of the gun.

Ray's defense, on the other hand, was paralyzed by the court's exclusion of this evidence because he was unable to rebut the State's adverse inferences with evidence explaining his behavior. Although Ray testified on his own behalf, the credibility of his testimony was significantly handicapped by the court's blanket exclusion of all evidence regarding narcotics, harassment, and threatening phone calls. He was forced to limit his testimony to the day of the shooting, beginning with his wife's telephone call advising him she was being followed. Even then, the court prohibited Ray from testifying, specifically, about the harassment. Instead, he was forced to refer to the harassment and threatening phone calls as the "events." The court further restricted his testimony when, shortly after he began to testify, it sustained the State's objection to the continued use of the word "events." The court stated:

... the, quote, "events" has nothing to do with this case. And I ruled that you can't talk about certain things in evidence. I can't let you call them all, quote, "events," and then talk about "events, events, events, events," obviously implying to the

---

8. This rule applies only where the statement of a third party is offered to explain the subsequent conduct of another. *State v. Costello,* 829 S.W.2d 556, 557 (Mo.App. E.D.1992). In this case, the statement explains why Ray armed himself before going to the Adams' house.

9. In closing, the State argued:

I suggest to you he was mad. I suggest to you he was madder than all get out at Eric Smith, mad enough to call the police, mad enough to grab a gun, mad enough to load that gun, mad enough to load it again after being told not to, mad enough to have a few drinks and go by that house a few times. It was the third one that was a problem.

jury there is more there than they are hearing, which may be your point, I understand. I don't think you are entitled to go into, quote, "event, event, event."

Had the "events" leading up to the shooting been relayed at trial, the jury could have concluded that Ray's pre-shooting state of mind did not include the requisite mental intent.[10] The effect of the court's ruling was to deny Ray the opportunity to adduce evidence that would explain his possession of a gun, which in turn would help support his claim that the shooting was accidental. We find the court's ruling to be an abuse of discretion, which resulted in prejudice to Ray.

Since the case must be remanded for a new trial, for the sake of judicial economy, we note that some elements of the defendant's offers of proof were properly excluded by the trial court. It is not error to refuse irrelevant or immaterial evidence. *State v. Harlston,* 565 S.W.2d at 782. Evidence is irrelevant or immaterial if it tends to draw the jury's attention away from the issues it must decide. *Id.* In particular, evidence that the Adams' house was "filled with illicit narcotics" is clearly irrelevant, prejudicial and inflammatory. The drugs were discovered when the police conducted an inventory search of the Adams' house, **after Howie had been shot.** Therefore, it is impossible that the information could have had any bearing on Ray's decision to take a weapon to the Adams' house.

Likewise, the fact that some of the young men at the Adams' residence on Monday night made lewd and juvenile comments to Connie is irrelevant to show Ray's state of mind. Finally, the commitment of the Ray's daughter into a drug rehabilitation program has absolutely no probative value to any issue in this case.

Because Ray's first point is dispositive of his appeal, we need not entertain his second and third points.

Ray's convictions for second degree murder and armed criminal action are reversed. His conviction for unlawful use of weapon

10. It is the defendant's state of mind before the killing that determines the level of homicide of

and resulting sentence has not been appealed and remains in effect. The case is remanded for a new trial on the charges of murder and armed criminal action.

All concur.

which he is guilty. *State v. Branch,* 757 S.W.2d at 600.