STATE of Missouri, Respondent,

v.

Gerren E. JACOWAY, Appellant.

No. WD 56604.

Missouri Court of Appeals,
Western District.

Dec. 28, 1999.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 1, 2000.

Application for Transfer Denied
March 21, 2000.

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

Before Presiding Judge LAURA DENVIR STITH, Judge VICTOR C. HOWARD and Senior Judge WILLIAM E. TURNAGE.

LAURA DENVIR STITH, Presiding Judge.

Defendant–Appellant, Gerren E. Jacoway, was convicted of one count of second degree murder, one count of first degree assault, and two counts of armed criminal action. Defendant alleges that the trial court erred when it declared testimony regarding the blood alcohol content of Mr. Charles Brown, one of the victims, inadmissible. Defendant argues that this evidence would have corroborated other testimony suggesting that Mr. Brown was intoxicated, and would logically tend to prove that Mr. Jacoway acted under the influence of sudden passion arising from adequate cause. Because we find that this evidence was neither logically nor legally relevant, the trial court did not abuse its broad discretion by excluding this evidence. Affirmed.

## I. FACTUAL BACKGROUND

Most of the facts concerning this case up to the time of the attack came from the testimony of Defendant, as he was the only witness to those events. According to his testimony, on August 29, 1997, he received his paycheck and deposited part of it, keeping two $100 bills for himself. On his way home he saw Mr. Charles Brown, and began to talk with him. Because Mr. Brown had repaired Defendant's transmission in the past and had attempted to repair Defendant's sister's car, Defendant asked Mr. Brown if he could help with some additional repairs to prepare Defendant's car for inspection. Mr. Brown agreed.

Defendant mentioned that before they could work on the car, he had to go to Builder's Square to buy some tools for the job. Mr. Brown accompanied Defendant to the store. On the way there, according to Defendant's testimony, Mr. Brown insisted that Defendant buy some beer. The two men stopped, bought a six-pack of beer and a pint of gin, and continued on to the store; both were drinking.

On their way back from Builder's Square, Defendant's car broke down on 71 Highway and the two men were given a ride back to the Good to Go, located at 75th and Prospect Streets, by a passerby. Mr. Brown offered to tow Defendant's car for $20 and some more beer, and Defendant purchased the beer for him. Although Defendant later testified that he would have preferred to have had another person tow his car because he did not want to continue to pay Mr. Brown and buy him beer, the fact is he and Mr. Brown got his car, and headed back to 71 Highway in it to retrieve Defendant's car. On the way, they stopped at a 7–Eleven Store. Defendant attempted to buy Mr. Brown gas and more beer there, but the cashier could not break Defendant's $100 bill. When Defendant informed Mr. Brown of this, Mr. Brown became very angry, yelled at Defendant, took his $100 bill and went back into the store. He returned from the store without any beer, and continued to be belligerent, causing Defendant to forget

to ask Mr. Brown to give the $100 bill back.

When Defendant and Mr. Brown arrived at Defendant's car, Mr. Brown was still hostile toward Defendant and demanded that he quickly prepare the car to be towed. As they towed the car, one of Mr. Brown's tires blew out. Now even more angry, Mr. Brown began swinging a lug wrench at Defendant, threatening to hurt him and break the windows in his car, and eventually chased him up the street. Defendant ran to his sister's house.

Remembering that he left his new tools in his car, Defendant asked his sister to drive him back to the car, which she did. After retrieving his tools without incident, they returned to Defendant's sister's house. Defendant testified further that, at this point, he tried to forget about the whole incident and took a shower. He later realized that he no longer had the $100 bill, however, and at that point ran out of the house in search of Mr. Brown.

Defendant testified that, while looking for Mr. Brown, he recalled that a few weeks earlier Mr. Brown said he had broken another man's arm. Considering this, as well as Mr. Brown's recent swinging of a lug wrench at him and the fact that Mr. Brown had been drinking, Defendant testified he felt he needed to protect himself. When he approached 71 Highway, therefore, he grabbed a piece of a bed frame he saw on the ground for protection and headed for the liquor store.

When he approached the store, Defendant testified that he saw Mr. Brown and his sister, Ms. Yvonne Barnes, walking behind him. Pointing the piece of bed frame at Mr. Brown, Defendant demanded his money. According to Defendant, Mr. Brown denied his request, grabbed the bed frame and started to swing at Defendant with his fists. Defendant then lost control, grabbed the frame back and proceeded to hit Mr. Brown with it. When

Defendant felt Ms. Barnes grab his arm, he hit her as well.

Defendant beat both Mr. Brown and Ms. Barnes to the ground, causing the death of Mr. Brown and serious injury to Ms. Barnes. Defendant then threw the piece of bed frame in some bushes and ran away. Following witness descriptions, police later found Defendant on the 71 Highway median and arrested him.

Mr. Jacoway was charged with first-degree murder and armed criminal action with respect to Mr. Brown, and first-degree assault and armed criminal action with respect to Ms. Barnes. In addition to instructing the jury on first degree murder, the court submitted instructions on the lesser included offenses of second-degree murder and voluntary manslaughter for the killing of Charles Brown. On September 10, 1998, the jury found Mr. Jacoway guilty of second-degree murder and armed criminal action for the August 27, 1997, killing of Mr. Brown, and also found Defendant guilty of first-degree assault and armed criminal action for the beating of Ms. Barnes. This appeal followed.

## II. LEGAL ANALYSIS

■ Mr. Jacoway's single claim of error on appeal concerns the exclusion of evidence which, if admitted, he alleges may have caused the jury to convict him of voluntary manslaughter rather than of second-degree murder. As he raises no claim of error in regard to his convictions of assault of Ms. Barnes or of armed criminal action, we affirm those convictions without further discussion.

Mr. Jacoway claims that the lower court erred when it determined that evidence of Mr. Brown's blood alcohol concentration (BAC)[1] was inadmissible, arguing:

> Evidence that Mr. Brown was legally intoxicated and in fact had a blood alcohol content of .186 was relevant to the issue of whether Mr. Jacoway acted un-

---

1. Defendant attempted to introduce this evidence via the testimony of Dr. Sam Gulino, the doctor who performed the victim's autopsy.

der the influence of sudden passion, caused by the actions of the intoxicated Charles Brown. Evidence of Mr. Brown's blood alcohol content would have corroborated Mr. Jacoway's testimony that Mr. Brown had been drinking heavily on the day he died. Such evidence would have logically tended to prove a matter in issue in this case, specifically, whether Mr. Jacoway acted under the influence of sudden passion arising from adequate cause.

Judge J.D. Williamson carefully considered defense counsel's argument and offer of proof on this issue, but sustained the State's objection to the attempt to introduce the victim's BAC as evidence on the basis that the issue of intoxication of the victim was uncontested, he had prohibited the State from denying intoxication, and the BAC of the victim would not directly show violence or support a claim of fear of the victim, stating:

> THE COURT: All the evidence hasn't come in, that's true. The issue of whether or not the defendant had been drinking is certainly admissible and it has already been referred to by witnesses who testified in the case and perhaps may be referred to by other witnesses that are coming up, I don't know that. The cases that have been supplied to me by both sides make it very clear that evidence of this nature is dependant upon and is admissible because of the defendant's knowledge of propensities of the victim that would put him in fear or in a position of anticipating some kind of violent reaction.
>
> The BAC of the deceased in my judgment does not supply – certainly this defendant didn't know the BAC of the victim, that evidence can't in any way indicate that he knew the victim has a blood alcohol of .186; and therefore, if the defendant was a physician or a doctor or in some position like that and in

fact had that information, it would be relevant. And in this context I think general evidence with regard to alcohol consumption is certainly relevant and I will permit it but I'm not going to permit the doctor to testify to the BAC because I don't think that falls within the parameters that I understood the Supreme Court to *require from the standpoint of the victim's conduct as it affects the intent and the knowledge of the defendant in this case* ... The BAC *itself* will not be permitted as evidence to be presented to the jury.

(emphasis added.)

■ We disagree with Defendant that the court erred in so ruling. It is well-settled that trial courts have broad discretion regarding the admissibility of evidence and will only be reversed when that discretion is abused and the abuse of discretion resulted in prejudice to Defendant. *State v. Woods,* 984 S.W.2d 201, 205 (Mo.App. W.D.1999); *State v. Ray,* 945 S.W.2d 462, 467, 469 (Mo.App. W.D.1997); *State v. Bowman,* 869 S.W.2d 901, 903 (Mo.App. W.D.1994). Trial courts are given such broad discretion to exclude marginally relevant evidence "because of concerns about prejudice, confusion of the issues, and interrogation that is only marginally relevant." *State v. Neely,* 979 S.W.2d 552, 561 (Mo.App. S.D.1998), *quoting, State v. Bowens,* 964 S.W.2d 232, 237 (Mo.App. E.D. 1998).

These are the very concerns which influenced the court's decision here. Defendant sought to introduce evidence of the victim's BAC to prove that Defendant acted under the influence of sudden passion, thus committing the crime of voluntary manslaughter. However, this crime will only be considered where a defendant has met his or her burden of injecting the issue of the influence of sudden passion arising from adequate cause. Sec. 565.023.2 RSMo 1994.[2] To meet this bur-

---

**2.** Sudden passion is a basis for a finding of voluntary manslaughter only if the sudden passion arose from adequate cause. Specifi-

cally, to commit the crime of voluntary manslaughter a person must cause:

den defendant must show that he acted under the influence of a sudden passion, defined as:

> passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation

Sec. 565.002(7) RSMo 1994. He must also show that the passion arose from adequate cause, meaning a:

> cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self control

Sec. 565.002(1) RSMo 1994.

■ Introduction of evidence of the BAC would directly show only that the victim was intoxicated. Defendant does not argue that the mere fact of the victim's intoxication would provide him with a basis to become so suddenly impassioned that he should be found guilty only of voluntary manslaughter. It appears that what Defendant really wanted to do was to show that the victim was drunk and violent and that the victim's violent conduct induced a sudden passion in him which reduced the severity of the crime from second degree murder to manslaughter. However, the fact that a victim has a high BAC does not necessarily mean that the victim was violent. Moreover, there is no evidence that Mr. Jacoway was aware of what the victim's BAC was at the time of the attack. Thus, evidence as to the victim's BAC could do little to bolster an argument by Mr. Jacoway that he was afraid of the victim due to the victim's BAC.

■ In so stating, we do not intend to suggest that evidence of the victim's intoxication was irrelevant. Clearly, evidence that the victim was drunk and violent would be relevant to a claim of sudden provocation or to a claim of self-defense. Such evidence would make the existence of a relevant fact more probable that it would be without the evidence. *State v. Wayman*, 926 S.W.2d 900, 905 (Mo.App. W.D. 1996). However, evidence must also be legally relevant. *State v. Strughold*, 973 S.W.2d 876, 888 (Mo.App. E.D.1998). In considering legal relevance, the court can consider concerns of prejudice, confusion of issues, waste of time, and find that these concerns outweigh the marginal probative value of the evidence offered.

Here, the fact that the victim was severely intoxicated was uncontested. Defendant testified in detail to the numerous types of alcohol he had purchased for the victim. Indeed, the trial court went one step further and instructed the State that it would not permit:

> a challenge to the concept of intoxication itself … The victim was intoxicated period. So any argument to the contrary is not going to be tolerated or any inference is not going to be allowed to be presented to the jury to the effect that there was no intoxication.

The State was thus given no latitude to even imply a lack of intoxication, and in fact the State itself mentioned the victim's intoxication in opening statement, as did defense counsel in both opening statement and closing argument. In light of all the other evidence pointing to intoxication, the lack of any evidence to the contrary, and the slight probative value of BAC as discussed above, the evidence of BAC could reasonably be considered cumulative and of marginal relevance, and thus the trial court acted well within its discretion in excluding it. *See State v. Wise*, 879 S.W.2d 494, 521–2 (Mo. banc 1994); *State v. Kidd*, 990 S.W.2d 175 (Mo.App. W.D. 1999).

■ Finally, we note that, in order to prove sudden passion which will convert a

---

the death of another person under circumstances that would constitute murder in the second degree under subdivision (1) of subsection 1 of section 565.021, except that he

caused the death under the influence of sudden passion arising from adequate cause

Sec. 565.023.1(1) RSMo 1994.

crime from second degree murder into voluntary manslaughter or self-defense, the Defendant must show that the passion was indeed sudden. Thus:

> 'Sudden passion' means 'passion caused by and arising out of provocation by the victim ... which ... arises at the time of the offense and is not solely the result of former provocation.' Section 565.002(7) RSMo 1994. 'Adequate cause' means 'cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control.' Section 565.002(1) RSMo 1994. For adequate cause to exist, a sudden, unexpected encounter or provocation must excite an uncontrolled passion, be it rage, anger, or terror. *State v. Boyd*, 913 S.W.2d 838, 843 (Mo.App.1995). The offense must have been done in a sudden passion and not after there has been a time to cool.

*State v. McCoy*, 971 S.W.2d 861, 864 (Mo. App. W.D.1998). In other words, it "is not the assault or the provocation alone that reduces the grade of the crime, but it is the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements of malice and deliberation necessary to constitute murder are absent, and therefore the crime is not murder, but manslaughter." *State v. Mudgett*, 531 S.W.2d 275, 280 (Mo. banc 1975), *citing, State v. Clough*, 327 Mo. 700, 705, 38 S.W.2d 36, 38 (Mo.1931). Because Defendant drank at various times during the day with Mr. Brown, Defendant was aware of the victim's intoxication long before their final confrontation. He did not, of course, know the victim's BAC. Even had he known it, however, any provocative effect that the victim's intoxication could have had on Defendant would have cooled off. Thus, such knowledge could not cause sudden passion at the time of the attack on the victim, since he had foreknowledge of it.

██ Moreover, in order to show sudden passion arising from adequate cause, he would have to prove that the victim at the time of the fight took some action which inflamed him, as well as that he was not the initial aggressor.[3] In light of Defendant's own testimony at trial that he brought the piece of metal with him and confronted Mr. Brown, and continued to hit him when he was on the ground and hit Ms. Barnes even though she did not strike him, causing her serious injury, there is no evidence to support such a claim. In any event, knowledge that Mr. Brown had a high BAC is so marginally, if at all, relevant to the issue of manslaughter that its exclusion could not have prejudiced Defendant.

For all of these reasons, the judgment is affirmed.

Judge VICTOR C. HOWARD and Senior Judge WILLIAM E. TURNAGE concur.

---

**3.** *Cf. State v. Bowman*, 869 S.W.2d at 903, in which the court found that defendant could not use the victim's BAC as a defense where the evidence showed that the victim tried to retreat, thus making the defendant the aggressor. As the aggressor, the defendant was not entitled to claim sudden passion.