STATE of Missouri, Respondent,

v.

Jeremiah V. JOHNSON, Appellant.

No. 24483.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 4, 2003.

Emmett D. Queener, Assistant State Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Karen L. Kramer, Assistant Attorney General, Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Jeremiah V. Johnson ("Appellant") appeals from his conviction and sentence after a jury trial found him guilty beyond a reasonable doubt of murder in the first degree of his sister Carrie Johnson. § 565.020.[1] In its judgment, the Circuit Court of Webster County imposed a sentence of life imprisonment without eligibility for probation or parole.

Appellant raises four points of trial court error. Appellant maintains the trial court abused its discretion in: (1) submitting a jury instruction on voluntary intoxication/drug use which violated his right to present the defense of a pre-existing mental disease or defect which was triggered or released by ingestion of LSD; (2) sustaining the State's strike for cause of a venire member; (3) applying a different standard in ruling on Appellant's motion to strike a venire member for cause than it applied to a State's strike for cause of a venire member; and (4) excluding a handwritten letter signed by the victim which purportedly supported Appellant's defense that the victim's death was the result of Appellant's mental disease or defect. We affirm.

Appellant does not challenge the sufficiency of the evidence. We view the evidence in a light most favorable to the verdict. *State v. Crawford,* 32 S.W.3d 201, 204 (Mo.App.2000).

The record shows that on the night of February 18, 2000, Appellant's brother, Matthew Johnson, and his friend, Heath

---

1. All statutory references are to RSMo 2000, unless otherwise specified.

Evans, arrived at the Johnson house after attending a basketball game. When the boys got there, they found Appellant and the victim, Carrie Johnson, sitting in the living room watching television. Mr. and Mrs. Johnson were visiting family in California and were not home. The four individuals made small talk, after which Matthew and his friend went into the kitchen for ice cream. The boys returned to the living room, and Appellant and Carrie went to Carrie's bedroom.

Some time later, Appellant called for Matthew to come into Carrie's bedroom. When he went to her room, Matthew found Carrie on the floor on her knees with Appellant behind her with a butcher-type knife and a Bible. Appellant asked Matthew what he thought would happen if Appellant cut Carrie's throat, and Matthew answered, "I guess she'd bleed to death." However, Matthew didn't think Appellant was serious because both Appellant and Carrie were smiling, so Matthew returned to the living room.

Later, the boys saw Appellant and Carrie in the kitchen. Appellant's arm was around Carrie's shoulder, and he still held a knife. Appellant stated that he had LSD, and he stuck it in Carrie's mouth. Appellant then asked Carrie if she got the LSD on her tongue, and she replied she had. Matthew told Appellant that he didn't like drugs and that he didn't want to be embarrassed in front of his friend. At that point, Appellant released Carrie and went and sat down in front of the wood stove, apologizing to Matthew about the drugs. Heath stated that he saw Appellant sitting in front of the wood stove, rocking back and forth and shaking. Matthew returned to the living room, but it is unclear whether Carrie returned to her room or stayed in the kitchen.

The next time the boys saw Appellant, he appeared in the doorway of the living room, standing behind Carrie, with his arm around her, holding a knife to her throat. Appellant stated that acid was the "Second Coming of Christ" and began to shake. Appellant began shaking and fell backwards over a chair, taking Carrie down with him, and pulling the knife across the front of her neck. After they fell onto the floor, Carrie rolled off of Appellant and lay there for a second before getting up. As Carrie ran out of the living room holding her throat, the boys both noticed that she had blood on her hands. Appellant, who was lying on his back on the floor, began stabbing himself in the chest. However, even at this point, Matthew believed it was a joke because both Appellant and Carrie were smiling the entire time.

The boys followed Carrie upstairs where they found her lying on her side in her parents' bedroom, bleeding from a cut on the right side of her throat and making a gurgling noise. The boys then ran back downstairs, where they heard Appellant say something about a gun. Since Appellant was between Matthew and the phone, he and Heath ran outside, got into Matthew's car and drove to Pam Smith's house, a neighbor who lived a half mile down the road, to call for help. As the boys were driving away from the Johnson house, Heath saw Appellant running in the direction that Carrie had gone.

When the boys arrived at Pam Smith's house, Matthew told her to call 911. Ms. Smith called 911, telling the dispatcher that Matthew claimed Appellant had just cut his sister's throat and that Matthew believed Appellant might be on LSD. Ms. Smith then called Appellant's older brother, Tim, who told her that Appellant must be on LSD and that she should go up to the house and talk to him. However, Ms. Smith refused to go to the Johnson house,

telling Tim he should be the one to go there since he was family.

After the 911 call was made, the boys returned to the Johnson house. As the boys sat in Matthew's car waiting for the deputies to arrive, they saw Appellant come out of the house, partially carrying or dragging Carrie. Appellant went to the middle of the yard and partially laid Carrie on his lap.

About ten minutes later, the police arrived, and the boys flagged them into the driveway. The officers shined their spotlights and saw Appellant in the yard with Carrie partially across his lap. Both were covered in blood, and Appellant appeared to have a knife in his hand. Carrie was still alive at this time because the officers could see her arm moving. At that point, the officers pulled their weapons, pointed them at Appellant, and ordered him to drop the knife. Appellant responded by saying that nobody listened to him. He also mumbled something about the "Second Coming of Christ." As the officers repeated their order for Appellant to drop the knife, Appellant repeatedly screamed that he loved his sister and wanted to relieve her from her pain.

The officers heard Appellant say that he was Jesus Christ and that his sister loved him and was willing to die for him. Appellant then raised the knife over his head in both hands and brought the knife down toward Carrie's neck. At that point the officers opened fire. Appellant was struck in the face by a bullet and knocked back.

The officers then rushed Appellant, handcuffed him, and restrained him with some difficulty. Appellant became resistant after the officers handcuffed him as he attempted to reach Carrie again. At that point, Appellant began twisting away, kicking at the officers. Appellant told one of the officers that he would "kick [his] ass" and that they did not know whom they were messing with. It took three or four officers to restrain Appellant.

Although Carrie was still moving after Appellant was shot, she was incoherent and unresponsive. A few minutes later, medical personnel arrived, and paramedics began to tend to Carrie. Once inside the ambulance, paramedics noticed two stab wounds to Carrie's chest, one of which had punctured a lung, in addition to the cuts to her neck. On the way to the hospital, Carrie stopped breathing. She had received two large lacerations on each side of her neck that had severed the jugular veins and carotid arteries. The medical examiner testified that Carrie bled to death as a result of the damage to the blood vessels in her neck.[2]

Appellant was transported by helicopter to the hospital. During the trip, he was coherent and responsive and answered questions appropriately. When he arrived at the hospital, Appellant was treated for his injuries. In addition to the bullet that had entered his nose and lodged behind his throat, Appellant had stab wounds to his chest and right leg. A toxicology examination of Appellant was performed. Although Appellant's blood tested positive for marijuana, the hospital lab lacked the ability to test for the presence of LSD, therefore, there was no toxicology report verifying Appellant's use of LSD on the night Carrie was killed.

In his defense, Appellant pleaded not guilty, and not guilty by reason of a mental disease or defect. Appellant later filed a notice of intent to rely on a defense of diminished capacity and a motion to allow evidence of voluntary drug usage. The

**2.** The medical examiner also testified that he discovered cuts on Carrie's fingers that he described as defensive wounds typically found if a person grabs a knife to thwart an attack.

State filed a motion in limine to preclude evidence of Appellant's voluntary drug usage under section 562.076. The trial court sustained a portion of the State's motion in limine, but allowed Appellant to present evidence of an underlying psychosis that was exacerbated by Appellant's ingestion of LSD. Appellant's expert, Dr. Thomas A. Blansett, testified that while the LSD did not cause his behavior, it may have played a role toward disinhibiting his already unstable emotions and thinking.

■ In his first point of error, Appellant argues that the trial court abused its discretion in submitting Instruction No. 7, the voluntary intoxication/drug use instruction, MAI–CR3d 310.50, to the jury because he claims it directed the jury not to fully consider his defense that he had a preexisting mental disease or defect which was triggered or released by his ingestion of LSD.

During the jury instruction conference, the state submitted Instruction No. 7, which reads as follows:

> The state must prove every element of the crime beyond a reasonable doubt. However, in determining the defendant's guilt or innocence, you are instructed that a drugged condition from drugs will not relieve a person of responsibility for his conduct.

The record reflects that although Appellant objected generally to all of the jury instructions tendered by the state, he did not specifically object to Instruction No. 7.

Rule 28.03, Missouri Rules of Court (2001), which governs objections to instructions and verdict forms, provides in pertinent part:

Counsel shall make specific objections to instructions or verdict forms considered erroneous. No party may assign as error the giving or failure to give instructions or verdict forms unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection. . . .

See State v. Bradshaw, 26 S.W.3d 461, 471 (Mo.App.2000). The record shows Appellant made no specific legal objection at trial to the instruction in question; consequently Appellant has not preserved this claim for appellate review. See State v. Hughes, 84 S.W.3d 176, 181 (Mo.App.2002).

■ However, Rule 28.03 does not expressly prohibit plain error review.[3] Bradshaw, 26 S.W.3d at 471. Review of jury instructions for plain error is discretionary. See State v. Lewis, 955 S.W.2d 563, 566 (Mo.App.1997). "[U]nless a claim of plain error facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted,' this Court will decline to exercise its discretion to review for plain error under Rule 30.20." State v. Brown, 902 S.W.2d 278, 284 (Mo. banc), cert. denied, 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995) (emphasis added) (quoting Rule 30.20). "For instructional error to rise to the level of plain error, the trial court must have so misdirected the jury as to cause manifest injustice or a miscarriage of justice." State v. Howard, 896 S.W.2d 471, 482 (Mo.App.1995).

Section 562.076.3 provides that where evidence has been presented that a person was in a voluntarily intoxicated or drugged condition, the jury shall be instructed that the evidence may not be used for the

---

**3.** Rule 30.20, in pertinent part, reads: "[P]lain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest in-justice or miscarriage of justice has resulted therefrom." Rule 30.20, Missouri Court Rules (2001).

purpose of negating a mental state which is an element of the offense. Thus, the trial court was required by statute to give the voluntary intoxication/drugged condition instruction as set out in MAI–CR3d 310.50. *See State v. Roberts,* 948 S.W.2d 577, 590 (Mo. banc 1997).[4]

Here, Dr. Blansett, Appellant's expert psychologist, testified that Appellant was "[m]entally ill, yes, before any drug induced state or ingestion." He further acknowledged that on February 18, 2000, "apart from the LSD and any marijuana usage" Appellant "[couldn't] conform his behavior to the confines of the law and he didn't appreciate what he was doing, the nature, quality, and wrongfulness of his actions." In our review of Instruction No. 7 we do not find anything which prevented the jury from considering Dr. Blansett's testimony. Given these circumstances we cannot say that manifest injustice or miscarriage of justice arose from the giving of Instruction No. 7. Point denied.

■ In his second point, Appellant asserts the trial court abused its discretion by sustaining the State's strike for cause of venire member Deborah Rader. Appellant argues that as a result of this abuse of discretion, Appellant was prejudiced by the probability that the jury ultimately selected from the venire panel "might not have been as fair and impartial."

During voir dire, venire member Rader informed the trial court that Appellant's defense counsel was representing her brother, a highway patrolman, in a separate matter. When questioned, Ms. Rader stated that she would find a police officer more credible than a layperson if their testimony conflicted, and claimed that she would probably tend to lean a little more toward the police officer. When asked whether defense counsel's representation of her brother would influence her in her position as a juror, Ms. Rader replied:

> I don't think I have a problem with that. I hope I would be totally fair but I might lean a little bit toward [defense counsel] since I appreciate what he's doing for my brother. I'm just trying to be honest there.

Upon further questioning by the trial court, Ms. Rader agreed that she could vote in favor of guilt even though it would be difficult, and that she was not favoring either side at the beginning of trial, even though defense counsel represented her brother in an unrelated matter. The State moved to strike Ms. Rader for cause, and the trial court sustained the State's strike over Appellant's objection.

■ "The qualifications of a prospective juror are not determined conclusively by a single response 'but are made on the basis of the entire examination.'" *State v. Hauserman,* 64 S.W.3d 893, 896 (Mo.App. 2002) (quoting *Brown,* 902 S.W.2d at 285). Because it is in the best position to evaluate the venire member's commitment to follow the law, the trial court has broad discretion in determining the qualifications of prospective jurors. *Id.* Thus, a trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is

---

4. In *Roberts,* defendant argued that his cocaine use combined with "dysrhythmic activity of the brain affecting the frontal and temporal lobe" which "produced impulsive behavior, disinhibitive behavior, mood swings and loss of judgment and reasoning ability" rendered him unable to deliberate. *Id.* at 586. Our supreme court observed that "[s]ection 562.076.3 clearly and unambiguously prohibits introduction of a voluntary drugged condition to negate a culpable mental state, even where the drugged condition exacerbates a tendency toward rage and anti-social behavior." *Id.* at 589. "If the underlying mental condition does not result in diminished capacity without the drug, the presence of the drug does not change the evidentiary calculus." *Id.*

clearly against the evidence and constitutes a clear abuse of discretion. *Id.* "A party asserting an abuse of discretion has the burden of showing a real probability that he was thereby prejudiced." *State v. Haley,* 73 S.W.3d 746, 755 (Mo.App.2002).

■ "[I]n cases other than those in which the range of punishment includes the death penalty, the usual rule is 'that error may not be predicated on the sustaining of a challenge for cause if a full panel of qualified jurors is tendered for peremptory challenge.'" *State v. Gray,* 812 S.W.2d 935, 938 (Mo.App.1991) (quoting *State v. Jones,* 749 S.W.2d 356, 360 (Mo. banc 1988)). Appellant does not claim that he was not provided a full panel of qualified jurors. *See Howard,* 896 S.W.2d at 487. Rather, he claims that he was prejudiced because Ms. Rader was not included on the panel, and therefore, the venire panel "might not have been as fair and impartial."

■ "With the exception of capital punishment cases, an accused has no right to any specific juror or to representation on the jury of a particular point of view." *State v. Blunk,* 860 S.W.2d 819, 821 (Mo. App.1993). The fact that the full panel of qualified jurors did not include Ms. Rader did not prejudice Appellant. *Howard,* 896 S.W.2d at 487. Accordingly, we find no basis for holding that the trial court abused its discretion when it excluded Ms. Rader as a prospective juror. Point two is denied.

■ In Appellant's third point, he contends that the trial court applied different standards in ruling on strikes for cause when it upheld the State's motion to strike venire member Rader for cause versus Appellant's strike for cause of venire member Jessica Jones. Specifically, Appellant posits that he was prejudiced because the trial court, in using a different standard, left Ms. Jones on the venire panel, and Ms. Jones did not believe that mental problems excused a crime.

A thorough review of the record, however, reveals that the trial court did, in fact, grant Appellant's strike for cause of Ms. Jones. Although the trial court did not strike Ms. Jones on his first request, Appellant later renewed his request to strike Ms. Jones for cause on the ground that she had testified she was somewhat skeptical of the defense of mental disease or defect. The State countered that Ms. Jones had rehabilitated herself. The trial court responded, "I think she's gone," thereby upholding Appellant's strike for cause. Moreover, the record indicates that Ms. Jones was not one of the jurors making the final cut of the venire panel from which the petit jury was ultimately selected. Since Ms. Jones was struck from the venire panel, there can be no claim of error. Point denied.

■ Finally, Appellant asseverates that the trial court abused its discretion by excluding from evidence a hospital discharge sheet and a handwritten letter signed by the victim and found in her bedroom after her death. Appellant maintains the hospital discharge sheet and handwritten letter supported Appellant's defense that the victim's death was the result of Appellant's mental disease or defect.

At trial, Appellant's mother was shown an exhibit identified as a hospital release for Carrie. Stapled to the hospital release was a three-page letter, which Mrs. Johnson acknowledged to be in her daughter's handwriting. The document was a photocopy of an undated letter addressed to a person named Charlie and purportedly written by Carrie. In the letter, Carrie discussed, among other things, her belief that some day her spirit would be joined with other spirits. Although Appellant ar-

gued that the victim's letter gave an insight to the way that Carrie and Appellant believed their souls would someday meet, the State objected to the exhibit as hearsay and irrelevant. The trial court sustained the State's objections and excluded the evidence.

 "Trial courts are vested with broad discretion over the admissibility of evidence, and appellate courts will not interfere with those decisions unless there is a clear showing of an abuse of that discretion." *State v. Collins,* 72 S.W.3d 188, 192 (Mo.App.2002); *State v. Ray,* 945 S.W.2d 462, 467 (Mo.App.1997). "The relevancy of evidence depends upon whether the evidence tends to confirm or refute a fact in issue or to corroborate evidence which is relevant and pertains to the primary issue in the case." *Ray,* 945 S.W.2d at 467.

 Appellant asserts the letter was relevant because it corroborated relevant evidence that bore on Appellant's defense of mental disease or defect excluding criminal responsibility or diminished his criminal capacity in Carrie's death. Defense witness, Dr. Robert J. Murney testified that Appellant experienced bizarre or unusual kinds of idealization of a religious nature. Appellant contends that Carrie's letter was relevant to corroborate that he might have succumbed to the bizarre religious idealization that was an element of his mental disease or defect. However, the letter was not written by Appellant. Nor was the letter written to Appellant. In fact, Appellant was not even mentioned in the letter. Although the letter may have established Carrie's state of mind at the time she wrote it, it in no way corroborated other relevant evidence that Appellant's actions were the result of *his* mental disease or defect. Furthermore, Appellant makes no argument as to how the hospital discharge sheet was relevant to his defense. "If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Collins,* 72 S.W.3d at 192. Under these circumstances we cannot say that the trial court's ruling was clearly against the logic of the circumstances then before the court and was so arbitrary and unreasonable as to shock the sense of justice and indicated a lack of careful consideration. *Id.* Point denied.

The judgment of the trial court is affirmed.

MONTGOMERY, P.J., and GARRISON, J., concur.